**Susan Lee MINARCINI et al., Plaintiffs,**

**v.**

**STRONGSVILLE CITY SCHOOL DISTRICT et al., Defendants.**

**Civ. A. No. C72-1222.**

United States District Court, N. D. Ohio, E. D.

Aug. 9, 1974.

---

Michael T. Honohan, Benesh, Friedlander, Mendelson & Coplan, Cleveland, Ohio, Howard Besser, Warrensville Heights, Ohio, for plaintiffs.

Kenneth G. Preston, Berea, Ohio, Robert Soltis, Parma, Ohio, Nicholas P. Pittner, Means, Bichimer, Burkholder & Baker, Columbus, Ohio, Kenneth E. Ramsey, Strongsville, Ohio, for defendants.

Arthur L. Cain, Cleveland, Ohio, for intervenor.

## MEMORANDUM, OPINION and ORDER

KRUPANSKY, District Judge.

This is an action instituted pursuant to the Civil Rights Act of 1871, 42 U.S.C. § 1983, wherein five minor plaintiffs, by next friends, purporting to represent a class of themselves and all other students enrolled in schools of the Strongsville City School District and thus similarly situated with plaintiffs, seek declaratory judgment and injunctive relief restraining defendants from continuing to violate plaintiffs' First and Fourteenth Amendment constitutional rights to academic freedom, freedom of speech, due process, and equal protection of the laws by the commission of acts which impose prior restraints upon publications and communications.

The thrust of plaintiffs' Complaint is to challenge the authority of the Board of Education of the Strongsville City School District (hereinafter Board) and the individually elected members thereof while acting within their official capacity and under color of law in accordance with Ohio Revised Code Chapter 3329, more specifically Ohio Rev.Code § 3329.-07, to determine by a majority of votes which textbooks should have been purchased and used in the schools under its control during the academic year 1972–73. Ohio Rev.Code § 3329.07 provides in part as follows:

The board of education of each city, exempted village, and local school district shall cause it to be ascertained and at a regular meeting determine which, and the number of each of the textbooks the schools under its charge require. . . .

Plaintiffs in this action concede the constitutionality of the foregoing legislative enactment.

The Complaint charges in substance that accepting the constitutional validity of Ohio Rev.Code § 3329.07, the Board's action in implementing said statutes by refusing to accept recommendations of the professional teaching staff was arbitrary and capricious thus resulting in an unconstitutional censorship of classroom material selected by said professional teaching staff in the exercise of its professional academic judgment thereby denying to plaintiffs their right to academic learning freedom, and thereby constituting a prior restraint on the freedoms of speech and press all in violation of plaintiffs' rights, privileges, and immunities sought to be secured and guaranteed by the free speech, due process and equal protection clauses of the First and Fourteenth Amendment to the Constitution of the United States.

The action was tried to the Court on July 9 and 10, 1974.

The record of testimony discloses little if any factual conflict as between the parties to this action. During 1970, the Board adopted the procedure here in issue to implement its legislative mandate to purchase textbooks for the schools within its District. The promulgated procedure provided that initial recommendations for proposed textbooks to be purchased during any given academic year be initiated by the Faculty Textbook Selection Committee (hereinafter Faculty Committee). The Faculty Committee in turn through its faculty department heads solicited individual faculty members within their respective departments for recommendations for curriculum text for use in their course assignments, designating such recommendations in an order of priority in the form of first, second, third or fourth. Thereafter the Faculty Committee submitted its recommendations to the Director of Secondary Education who in turn provided copies of the proposed texts to a Citizens Textbook Committee. The Citizens Textbook Committee had a composite membership of 16 residents from the School District. One representative to the Committee was designated by each of the five Board members; one representative was designated by the respective PTA's of each of the nine schools within the School District;

one representative was designated by the PTA Council of the District and one representative was designated by the preschool PTA of the District. Subsequent to its consideration of the Faculty Committee's suggestions the Citizens Textbook Committee submitted its evaluations and suggestions to the Director of Secondary Education who in turn presented the recommendations of both the Faculty Committee and the Citizens Textbook Committee to the Board's Educational Program and Policy Committee composed of two Board members. The Educational Program and Policy Committee thereafter presented the recommendations of the Faculty Committee, the Citizens Textbook Committee and its own evaluation to the entire Board for its final consideration and selection.

Only the English Department's proposed selections are here in issue.

During the spring of 1972, the English Department through its Chairman, Mrs. Carol Petersen, recommended that the following textbooks be purchased by the Board for the academic year 1972–73 (Plaintiffs' Exhibit 4, page 131);

| TITLE | PUBLISHER | AUTHOR | EDIT. | COURSE | PRICE | EST. QUANT. |
|---|---|---|---|---|---|---|
| ENGLISH 9 LITERATURE | | | | | | |
| Outlooks Through Literature | Scott Foresman | Pooley | 1969 | Eng. 9 | 4.95 | 425 |
| I (Me) | Holt, Rinehart & Winston | Brooks | 1971 | Eng. 9 (Low) | 80.00 per set | 2 sets |
| HIGH SCHOOL LITERATURE | | | | | | |
| Modern | | | | | | |
| Catch 22 | Dell | Miller [sic Heller] | 2nd | Eng. 10–12 | 1.25 | 170 |
| Romantics | | | | | | |
| The Portable Mark Twain | Viking Press | Bernard DeVoto Ed. | 1968 | Eng. 10–12 | 3.95 | 180 |
| Early Romantics | | | | | | |
| Edgar Allen Poe: Selected Poetry and Prose | Random House | Thomas Mabott Ed. | —— | Eng. 10–12 | 1.15 | 180 |
| Drama | | | | | | |
| Six Modern American Plays | Modern Library | O'Neill | —— | Eng. 10–12 | 1.45 | 90 |
| Long Days Journey Into Night | Yale Univ. Press | O'Neill | —— | Eng. | 1.95 | 90 |
| 20th Century Novelist | | | | | | |
| William Faulkner: Selected Short Stories | Random House | William Faulkner | 1962 | Eng. 10–12 | 2.95 | 180 |

On April 4, 1972, subsequent to a review and discussion of all the textbooks proposed by the Faculty Committee the Citizens Textbook Committee made the following report to the Board's Educational Program and Policy Committee (Plaintiffs' Exhibit 11):

*Literature*

OUTLOOKS THROUGH LITERATURE
I (ME)                                         —not objectionable
REFLECTIONS IN LITERATURE

GOD BLESS YOU MR. ROSEWATER          —not objectionable

CATCH 22—The majority of the committee found this book objectionable. It was felt that there would be no objection to having the students read this selection if it was not a required text. Although GOD BLESS YOU MR. ROSEWATER was found not objectionable, the entire committee felt that between the two selections in the Modern section, CATCH 22 surpassed GOD BLESS YOU MR. ROSEWATER and should have precedence if no other choice is to be made. In the discussion of Modern writing it was agreed by the majority that there must be better books from which to make a selection.

HUCKLEBERRY FINN
THE PORTABLE MARK TWAIN
THE PORTABLE POE                          —not objectionable
EDGAR ALLEN POE: SELECTED POETRY & PROSE

SIX MODERN AMERICAN PLAYS—The majority finds no objection to the entire book. A minority objects to the offensive language in the play "Mr. Roberts".

LONG DAYS JOURNEY INTO NIGHT—The committee did not receive any copies of this book to review. A few members read a library copy and found no objection. A minority objected to the crude language.

THE PRICE
WILLIAM FAULKNER: SELECTED SHORT
    STORIES                                  —not objectionable

--------

Board member Mrs. Ellen J. Wong, Chairman of the Educational Program and Policy Committee, presented that Committee's report together with recommendations of the Faculty Committee, and the Citizens Textbook Committee to the entire Board. Thereafter the Board collectively approved for purchase all initial recommendations of the Faculty Committee with the exception of the novel "Catch 22" by Joseph Heller. "Catch 22" represented faculty member John Lohr's first choice text recommendation for his Modern Literature English Course. Final action thereon was deferred by the Board in order to afford it an opportunity to meet with members of the English Department faculty to further discuss the proposal.

On May 18, 1972, the members of the Board met with Raymond J. Kestner, Director of Secondary Education of the Strongsville City School District, Mrs. Carol Petersen, Chairman of the Strongsville High School English Department, and various other faculty members of the said English Department, including John Lohr and David Edmonds. As previously stated the purpose of the

meeting was "so the staff could communicate to the Board their reasons for recommending 'Catch 22' as part of the English text for 1972-73." During the course of the meeting the merits of purchasing "Catch 22" were openly discussed between all parties in a climate of calm objective deliberation free of emotional displays of anger or veiled intimidation. The discussions encompassed the English Department's suggestion of "God Bless You, Mr. Rosewater" by Kurt Vonnegut, Jr. as a substitute selection for "Catch 22". The latter text represented the second choice of John Lohr, the Instructor assigned to teach the Modern Literature Course.

On June 8, 1972, at a duly convened meeting the Board voted not to purchase the novel "Catch 22" for use as a textbook during the 1972-73 academic year.

On June 17, 1972, at a duly convened special meeting of the Board it refused to consider "God Bless You, Mr. Rosewater" by Kurt Vonnegut, Jr., the English Department's second choice for the Modern Literature Course as a substitute text for "Catch 22".

At a duly convened special meeting of the Board on August 19, 1972, the Board refused to consider the English Department's third choice selection of "Cat's Cradle" by Kurt Vonnegut, Jr., as a substitute text for the Modern Literature Course, although it appears from the testimony that the novel had been previously utilized as a text by the English Department during the year 1969.

On September 14, 1972, at a duly convened meeting of the Board, John Lohr's fourth selection of "Travels With Charlie" by John Steinbeck was approved as a text for the Modern Literature Course during the academic year here in question.

It should be noted that throughout the period of time during which the Board considered the various proposals here in issue, roughly from the middle of April through mid-September, 1972, its members discussed the proposals with its professional administrative staff including the Director of Secondary Education, faculty members assigned to the English Department, members of the Citizens Textbook Committee, and various interested members of the public. Although the evidence is conflicting, it appears further that prior to final action on each novel the individual Board members had read parts of each of the books, reviewed them, or scanned through them and were in a general manner personally familar with the substance of the novels.

All Board meetings during which curriculum text purchases were discussed, with the exception of the Board's conference with faculty members of the English Department on May 18, 1972, were matters of public knowledge and open to public participation. No individual was denied the right to appear before the Board to express an opinion or discuss pending action; no individual was ruled out of order at any such meeting, nor were any motions proffered or approved to eliminate debate thereon. Additionally, all Board members were readily available to the public for comment about the books which are the subject of this controversy. At all times each Board member acted in good faith and in a manner that each considered to be in the best interest of the School District.

The reasons expressed by Board members in support of their action refusing the purchase of the initially proposed novels are not unreasonable. Those reasons in substance reflect an attitude that the proposed novels were adult-orientated and, therefore, less suitable for use as curriculum text for grades 10 through 12 than other available novels, and that the books were better suited for college level instruction and study.

■ Literary value of the three novels having been conceded by the parties, consideration by the Court of testimony presented by Kurt Vonnegut, Jr., and Dr. Mary Joanne Monahan together

with the deposition of Joseph Heller in support thereof is unnecessary. Similarly, obscenity as defined in the Supreme Court's pronouncements set forth in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), as subsequently interpreted by Jenkins v. Georgia, 418 U.S. 153, 94 S.Ct. 2750, 41 L.Ed.2d 642 (decided June 24, 1974), is eliminated as an issue herein by agreement of counsel.

Thus, apparent from the foregoing, the novels "Catch 22" by Joseph Heller, "God Bless You, Mr. Rosewater" and "Cat's Cradle" by Kurt Vonnegut, Jr., are not on trial in this proceeding. Rather, the only issue of concern for the Court's determination is the Board's authority to ultimately select, in the manner implemented herein, textbooks to be purchased for use in the Strongsville City School District.

Absent emotionally charged cries of censorship, violation of academic freedom, repression and book burning there evolves a reality of modern day society where censorship, or "editorial judgment" however characterized in whatever degree, is an inescapable aspect of operating a school system, a library, a televised news program, a monthly or weekly magazine, or a daily newspaper. Some individual or group must ultimately decide that a particular news item is worthy of reporting or printing or disregarding as worthless, that a book is worthy of publication or shelving. The responsibility embraces the authority to declare a book, a news item, or event a matter of great public interest or worthless and unfit to print. In the same fashion news commentators on a daily basis disregard hundreds of stories and items before fashioning the network's evening news programs. Syndicated news columnists annually discard enumerable column ideas as unworthy of discussion. Every editor, publisher, program director, librarian, teacher, school board member, or business executive is confronted with the same decision-making process of inclusion or exclusion on a daily basis. Each believes the adopted decision right and proper to the possible dissent of others.

Ideological conflicts within communities of a free society exacerbate and subside with the ever changing moods and structure of its population. The endless cycle moves from thesis to antithesis through synthesis and back to thesis only to renew itself from ever evolving dissent. Peaceful transition through the cycle, i. e., synthesis of antithesis, is insured in an open society by proportionate legislative representation founded in the elective process. The Court should not and cannot interfere with the orderly procedure except as an impartial arbiter insuring equal protection of the laws and constitutional guarantees free of arbitrary and capricious action or abuse of authority by the antagonists.

Confronted with the removal by the New York City Community School Board of the novel "Down These Mean Streets" by Piri Thomas from all Junior High School libraries in the School District, the Second Circuit Court of Appeals in 1972 deciding Presidents Council, Dist. 25 v. Community Sch. Brd. No. 25, 457 F.2d 289 (2nd Cir. 1972), cert. denied, 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972) stated:

. . . Since we are dealing not with the collection of a public book store but with the library of a public junior high school, evidently some authorized person or body has to make a determination as to what the library collection will be. It is predictable that no matter what choice of books may be made by whatever segment of academe, some other person or group may well dissent. The ensuing shouts of book burning, witch hunting and violation of academic freedom hardly elevate this intramural strife to first amendment constitutional proportions. If it did, there would be a constant intrusion of the judiciary into the internal affairs of the school. Academic freedom is scarcely fostered by the intrusion of three or even nine federal jurists making curriculum or library

choices for the community of scholars. When the court has intervened, the circumstances have been rare and extreme and the issues presented totally distinct from those we have here. . . . 457 F.2d at 291–292.

The Second Circuit further noted that:

The administration of any library, whether it be a university or particularly a public junior high school, involves a constant process of selection and winnowing based not only on educational needs but financial and architectural realities. To suggest that the shelving or unshelving of books presents a constitutional issue, particularly where there is no showing of a curtailment of freedom of speech or thought, is a proposition we cannot accept [footnote omitted]. *Id.* at 293.

The events of the two years since the Board's initial action in 1972 dramatically demonstrates the dynamics and the pragmatism of the cycle in operation. As reflected by the stipulations herein, on January 1, 1974, two new members were elected to the Board. The events disclose that thereafter the newly constituted Board in a controversial decision approved the purchase of the novel "Manchild in the Promised Land" by Clarence Brown as curriculum text for use in elective high school English course styled "Street Literature", over the protest of a segment of the community. The Board, as constituted in 1972, moved from its original decision to exclude the purchase of certain controversial novels as curriculum text for the academic year 1972–73 to a decision of the Board, as presently constituted, to include a controversial novel of similar substantive and literary composition as those here in issue for the academic year 1974–75.

Obvious from the clear and concise language of § 3329.07 of the Ohio Revised Code, the legislative mandate charged the Board of Education of each city school district, an elective body, with the ultimate authority and responsibility to ascertain and determine which, and the number of textbooks the schools under its charge require. Apparent

from Ohio Revised Code Chapter 3329 including §§ 3329.01 through 3329.11, wide discretion was vested in the elective Boards to implement the mandate.

The Legislature of Ohio having by law duly determined that the responsibility for the selection and determination of materials for use in the high school curriculum and public school libraries of the City of Strongsville City School District is to be vested in the Board of Education, the constitutionality of the relevant statutory enactments pertaining thereto being conceded, the Court deems it inappropriate to consider the wisdom of the Board's determination. *Presidents Council, Dist. 25, supra.*

Although the Court may sympathize, in certain respects, with real or imagined ideological and personality conflicts between professional teaching staffs and respective Boards of Education in the area of curriculum planning and/or implementation, any change thereof must develop through the legislative process rather than judicial decision. The State having duly and legally acted thereon, absent constitutional infringements, the Court cannot and will not substitute its individual judgment for that of the Ohio Legislature. The Court's function herein is necessarily limited to one of constitutional inquiry and adjudication on the facts and the record before it, namely, has the Board transgressed the First Amendment rights of the plaintiff students herein. In Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the United States Supreme Court stated:

By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. 393 U.S. at 104, 89 S.Ct. at 270.

The gravamen of plaintiffs' challenge to the Board's action is its asserted failure to specify standards and procedures for purchasing textbooks (pursuant to

Ohio Revised Code Chapter 3329), i. e., failure to provide for outside psychological and professional consultation in order to confirm or disregard the English Department's proposals, said acts, individually and collectively, constituting arbitrary and capricious conduct on the part of the Board in violation of the plaintiffs' First and Fourteenth Amendment rights. Plaintiffs' assertion is contrary to the weight of evidence as reflected in the review procedure voluntarily adopted by the Board as hereinbefore set forth.

The procedure viewed in its entirety was fair, equitable and logical. It provided input from faculty members assigned to instruct given courses through appropriate department heads, through the Faculty Committee representing the professional staff on the one hand and evaluation by a 16 member Citizens Textbook Committee representing a broad cross section of the entire School District on the other hand; through the Board's Educational and Program Policy Committee to the entire Board for final consideration and selection after consultation with its in-house professional and administrative staff.

Nor does the record disclose arbitrary or capricious acts by the Board taken either collectively or individually in administering the procedure. Affirmatively, the record reflects a series of open Board hearings, consultation with members of the English Department, discussions with various members of the professional administrative staff, with members of the Citizens Textbook Committee and any and all other interested parties before its ultimate action. All meetings of the Board and professional staff were conducted in a calm restrained atmosphere free of emotionalism, vindictiveness or intimidation. Individual Board members arrived at decisions in good faith after conscientious consideration of the over-all problem.

Considering further the resources available to and utilized by the Board members individually and collectively for evaluating and deciding the issues con-

fronting them together with the educational and experience level of each member thereof, the necessity for outside professional assistance suggested by the plaintiffs herein is without merit under the circumstances.

At this juncture the Court is constrained to comment upon the implications of First and Fourteenth Amendment infringements inferred by plaintiffs' legal precedent and the application of said precedent as it bears upon the facts and issues developed herein.

In Epperson v. Arkansas, *supra*, cited by plaintiffs herein, the United States Supreme Court invalidated a state statute making it unlawful for a teacher in any state supported school to use a textbook which teaches theories of evolution. The Supreme Court vitiated the statute on the specific ground that "the State may not adopt programs or practices in its public schools or colleges which 'aid or oppose' any religion". 393 U.S. at 106, 89 S.Ct. at 271. "The State's undoubted right to prescribe curriculum for its public schools does not carry with it the right to prohibit, on pain of criminal penalty, a teaching of a scientific theory or doctrine where that prohibition is based upon reasons that violate the First Amendment." *Id.* at 107, 89 S.Ct. at 272. The action herein obviously does not present a religious establishment or free exercise issue, nor, as reflected by the weight of the evidence, did the Board's action ban the teaching of any theory or doctrine. The literary style or content of either author was not placed off limits by the Board. The Board resolved not to purchase the English Department's first, second and third choice novels for use as a textbook. The Board's action per se did not preclude any teacher or librarian within the school system from discussing the novels in the classroom with any students or from assigning any or all of such novels as outside or supplemental reading. The evidence is firm and uncontradicted that the Board passed no resolution, issued no directive either written or oral precluding any instructor from discussing any or all of the novels in class or assigning

any such novel as outside reading or the subject of research or book review. The record further discloses some testimony that John Lohr and David Edmonds both discussed to some degree one or more of the novels as part of their respective courses. The plaintiff Susan Lee Minarcini testified that she had read all three novels at some time or other, with parental consent. It is equally apparent from the record that no teacher was intimidated nor reprisals threatened for any classroom discussions or assignments related to the novels. Although the plaintiffs infer that the teaching contract of John Lohr was not renewed as a direct or indirect result of his first, second and third choice recommendations for his Modern Literature Course, the Court is satisfied that his proposals here in issue were in no way related to the Board's refusal to renew his teaching contract at the close of the 1973 academic year.

■ Plaintiffs further cite three teacher discharge cases, namely, Keefe v. Geanakos, 418 F.2d 359 (1st Cir. 1969); Mailloux v. Kiley, 448 F.2d 1242 (1st Cir. 1971), and Parducci v. Rutland, 316 F.Supp. 352 (M.D.Ala.1970). Factually the cited cases are distinguishable from the case at bar for the reason that, as previously stated, no teacher was discharged or threatened with discharge nor were any members of the Strongsville teaching staff instructed not to discuss the novels or utilize them as outside or supplemental reading. Additionally, the Court is in complete accord with the underlying principles of plaintiffs' authority, namely, the professional teacher's obligation to utilize individual teaching methodology, which was not violated by the Board's action herein.

In citing Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) plaintiffs advance the argument that absent resulting disruption or disorder arising from use of the controversial novels here in issue the Board is constitutionally bound to purchase said novels as curriculum textbooks for utilization in classroom instruction. There is no issue before this Court conflicting with the principles established in the Supreme Court's pronouncements in *Tinker*, namely:

First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years. *Id.* at 506, 89 S.Ct. at 736.

Apparent therefrom, the Supreme Court did intrude into the field of public education by invalidating a school principal's regulation suspending students displaying black armbands symbolizing objection to Vietnam hostilities. The regulation was deemed in violation of the student's rights to free speech absent evidence to support a finding that the students' conduct materially disrupted class work or the invasion of rights of others. *Tinker, supra,* is thus distinguishable upon its facts and application to this proceeding. Collateral cases of Antonelli v. Hammond, 308 F.Supp. 1329 (D.Mass.1970) and James v. Brd. of Educ., 461 F.2d 566 (2nd Cir. 1972), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 491 (1972) [high school teacher discharged for wearing black armband] for the same reason are equally not applicable.

■ One final matter remains for the Court's consideration. Defendant-Intervenors move the Court to dismiss that part of plaintiffs' Complaint designating a class action. Plaintiffs request that they be permitted to maintain this action as a class action pursuant to Rule 23, Fed.R.Civ.P., which class composes all students enrolled in the schools operated and maintained by the Strongsville City School District.

Intervenors contend that plaintiffs' class designation is improper pursuant to Rule 23 for the reason that a majority of Strongsville students and parents thereof are not in sympathy with plain-

tiffs' views, and are, therefore, not "similarly situated". Intervenor's argument is without merit. All members of the purported class are affected by actions taken by the Board of Education of the Strongsville City School District. The Court need not speculate how many students therein may need or desire to invoke First Amendment protection against such action; the ultimate fact that each student is subject thereto is sufficient. *See,* Arkansas Educ. Ass'n v. Board of Ed., Portland, Ark. Sch. Dist., 446 F.2d 763 (8th Cir. 1971); Norwalk Core v. Norwalk Redevelopment Agency, 395 F.2d 920, 937 (2d Cir. 1968); Sullivan v. Houston Independent School District, 307 F.Supp. 1328 (S.D.Texas 1969); Wright, Class Actions, 47 F.R.D. 169 (1969). Accordingly, the Court finds that this action is maintainable as a class action pursuant to Rule 23(a), (b) (2), Fed.R.Civ.P., and is, therefore, certified as such. The class shall comprise all students enrolled in the schools operated and maintained by the Strongsville City School District.

## CONCLUSIONS

Upon the pleadings, the evidence in its entirety including the exhibits, the briefs and arguments of counsel, the Court concludes:

1. This action is properly maintained as a class action pursuant to Rule 23, Fed.R.Civ.P., and the class is designated as all students enrolled in the schools operated and maintained by the Strongsville City School District;

2. Chapter 3329 of the Ohio Revised Code more particularly § 3329.07 mandates the Board of Education of each City School District to ascertain and determine at regularly scheduled meetings which, and the number of each of the textbooks the schools under its charge require;

3. The Board promulgated a broad and equitable representative procedure providing for initial recommendations to originate with various faculty members and department heads within the District with evaluation by a Citizens Textbook Committee composed of representatives from each of the various schools within the District and consultation with its professional administrative staff members as an information resource available as an aid in textbook selection;

4. The procedure thus adopted was openly implemented and faculty members were not foreclosed or limited either formally or informally, directly or indirectly, to utilize individual teaching methodology or from discussing any subject including the books here in issue or assigning said books as outside or supplemental reading or the subject of a review in the course of classroom instruction. No faculty member was intimidated, reprimanded, discharged or threatened with such action as a result of circumstances here involved;

5. Each of the novels here in issue have literary value and are not obscene within the purview of contemporary legal precedent;

6. Final action of the Board in determining which books were to be purchased by the Strongsville City School District for use during the academic year 1972–73 was taken in good faith and predicated upon available information, from reviewing the books, consulting with the administrative professional staff including faculty members of the English department, members of the Citizens Textbook Committee and other interested representatives of the community;

7. The action of the Board as reflected by the evidence in its entirety was not arbitrary and capricious;

8. Considering the educational and experience level of each elected Board member together with its resources of information avail-

able to it through its professional administrative staff, faculty members, and Citizens Textbook Committee, outside professional consultants, psychologists and/or educational counselors were neither required nor necessary under the circumstances herein;

9. The three novels here in issue were available to students and/or members of the community through commercial outlets and public libraries and no student was directly or indirectly imposed upon not to read or discuss any of the novels;

10. The plaintiffs herein were not deprived of academic freedom nor did the Board's action constitute a limitation of First and Fourteenth Amendment rights nor any infringement thereof.

The foregoing shall constitute the Court's findings of fact and conclusions of law consistent with Rule 52(a), Fed. R.Civ.P.

It is so ordered.