**Marilyn PARDUCCI, Plaintiff,**

v.

**Jack D. RUTLAND, individually and as principal of Jeff Davis High School, W. S. Garrett, individually and as Assistant Superintendent of the Montgomery County Board of Education; Walter McKee, individually and as Superintendent of the Montgomery County Board of Education; the Montgomery County Board of Education, et al., Defendants.**

**Civ. A. No. 3072–N.**

United States District Court,
M. D. Alabama, N. D.
June 9, 1970.

Morris Dees, Montgomery, Ala., for plaintiff.

Vaughan Hill Robison, and Joseph D. Phelps (of Hill, Robison, Belser & Phelps), Montgomery, Ala., for defendants.

## ORDER

JOHNSON, Chief Judge.

Plaintiff was dismissed from her position as a high school teacher in the Montgomery public schools for assigning a certain short story to her junior (eleventh grade) English classes. In her complaint, which was filed with this Court on April 27, 1970, plaintiff alleges that defendants, in ordering her dismissal, violated her First Amendment right to academic freedom and her Fourteenth Amendment right to due process of law. Plaintiff's claim for damages and request for jury trial as contained in her initial complaint were stricken by amendment. The defendants are the members of the Montgomery County Board of Education, the Superintendent of Schools of the county, the Associate Superintendent, and the Principal of plaintiff's high school. Plaintiff's request for injunctive relief is authorized under the Civil Rights Act of 1871, 42 U.S.C. § 1983. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(3) and (4).

Plaintiff was graduated with high honors from Troy State University in June, 1969. Upon graduation, she entered into a one-year contract to teach English and Spanish at Jefferson Davis High School in Montgomery, such contract to commence in October, 1969.

On April 21, 1970, plaintiff assigned as outside reading to her junior English classes a story, entitled "Welcome to the Monkey House." The story, a comic satire, was selected by plaintiff to give her students a better understanding of one particular genre of western literature—the short story. The story's author, Kurt Vonnegut, Jr., is a prominent contemporary writer who has published numerous short stories and novels, including *The Cat's Cradle* and a recent best seller, *Slaughter-House Five*.

The following morning, plaintiff was called to Principal Rutland's office for a conference with him and the Associate Superintendent of the school system. Both men expressed their displeasure with the content of the story, which they described as "literary garbage", and with the "philosophy" of the story, which they construed as condoning, if not encouraging, "the killing off of el-

derly people and free sex."[1] They also expressed concern over the fact that three of plaintiff's students had asked to be excused from the assignment and that several disgruntled parents had called the school to complain. They then admonished plaintiff not to teach the story in any of her classes.

Plaintiff retorted that she was bewildered by their interpretation of and attitude toward the story, that she still considered it to be a good literary work, and that, while not meaning to cause any trouble, she felt that she had a professional obligation to teach the story. The Associate Superintendent then warned plaintiff that he would have to report this incident to the Superintendent who might very well order her dismissal. Plaintiff, who by this time had become very emotionally upset, responded to this threat by tendering her resignation.

On April 27, a hearing was held before this Court on plaintiff's motion for a temporary restraining order. Although plaintiff's motion for a temporary restraining order was subsequently denied, defendants agreed at the hearing to allow plaintiff to withdraw her resignation and to accord plaintiff a hearing before the Montgomery County Board of Education on the question of dismissal.[2] The School Board hearing, in which both sides participated, was held the following day. On May 6, the School Board notified plaintiff that she had been dismissed from her job for assigning materials which had a "disruptive" effect on the school and for refusing "the counselling and advice of the school principal." The School Board also advised the plaintiff that one of the bases for her dismissal was "insubordination" by reason of a statement that she made to the Principal and Associate Superintendent that "regardless of their counselling" she "would continue to teach the eleventh grade English class at the Jeff Davis High School by the use of whatever material" she wanted "and in whatever manner" she thought best.

Having exhausted all her remedies within the school system, plaintiff immediately renewed her motion for a preliminary injunction in which she sought her immediate reinstatement as a teacher. The present submission is upon this motion, the response thereto by the defendants, the evidence taken orally before the Court, including the testimony of several witnesses and exhibits thereto, and the briefs and arguments of the parties.

At the outset, it should be made clear that plaintiff's teaching ability is not in issue. The Principal of her school has conceded that plaintiff was a good teacher and that she would have received a favorable evaluation from him at the end of the year but for the single incident which led to her dismissal.

I

Plaintiff asserts in her complaint that her dismissal for assigning "Welcome to the Monkey House" violated her First Amendment right to academic freedom.

That teachers are entitled to First Amendment freedoms is an issue no longer in dispute. "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969); see Pickering v. Board of Education, etc., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Pred v. Board of Public Instruction, etc., 415 F.2d 851, 855 (5th Cir. 1969). These constitutional protections are unaffected by the presence or absence of tenure under state law. McLaughlin v. Tilendis, 398 F.2d 287 (7th

---

1. Both Mr. Rutland and Mr. Garrett later testified that neither of them was much of a reader, had any special expertise in the field of literature, or had ever taught an English course.

2. Since plaintiff was only a probationary teacher, she was not entitled under state law to a hearing before the School Board. Code of Alabama, Tit. 52 § 351 et seq.

Cir. 1968); Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966), cert. denied, 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967).

█ Although academic freedom is not one of the enumerated rights of the First Amendment, the Supreme Court has on numerous occasions emphasized that the right to teach, to inquire, to' evaluate and to study is fundamental to a democratic society.[3] In holding a New York loyalty oath statute unconstitutionally vague, the Court stressed the need to expose students to a robust exchange of ideas in the classroom:

> Our nation is deeply committed to safeguarding academic freedom, which is of transcendant value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. * * * The classroom is peculiarly the "marketplace of ideas." [4]

Furthermore, the safeguards of the First Amendment will quickly be brought into play to protect the right of academic freedom because any unwarranted invasion of this right will tend to have a chilling effect on the exercise of the right by other teachers. Cf. Wieman v. Updegraff, 344 U.S. at 194, 195, 73 S.Ct. 215 (Frankfurter, J., concurring); Pickering v. Board of Education, etc., *supra* 391 U.S. at 574, 88 S.Ct. 1731.

█ The right to academic freedom, however, like all other constitutional rights, is not absolute and must be balanced against the competing interests of society. This Court is keenly aware of the state's vital interest in protecting the impressionable minds of its young people from *any* form of extreme propagandism in the classroom.

A teacher works in a sensitive area in a schoolroom. There he shapes the attitudes of young minds towards the society in which they live. In this, the state has a vital concern.[5]

█ While the balancing of these interests will necessarily depend on the particular facts before the Court, certain guidelines in this area were provided by the Supreme Court in Tinker v. Des Moines Independent Community School District, *supra*. The Court there observed that in order for the state to restrict the First Amendment right of a' student, it must first demonstrate that:

> [T]he forbidden conduct would *"materially* and *substantially* interfere with the requirements of appropriate discipline in the operation of the school". [Emphasis added.] [6]

The Court was, however, quick to caution the student that:

> [Any] conduct * * * in class or out of it, which for any reason—whether it stems from time, place or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.[7]

Thus, the first question to be answered is whether "Welcome to the Monkey House" is inappropriate reading for high school juniors. While the story contains several vulgar terms and a reference to an involuntary act of sexual intercourse, the Court, having read the story very carefully, can find nothing

---

3. See e. g., Sweezy v. New Hampshire by Wyman, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

4. Keyishian v. Board of Regents, etc., 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L. Ed.2d 629 (1967). Cf. Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

5. Shelton v. Tucker, 364 U.S. 479, 485, 81 S.Ct. 247, 250, 5 L.Ed.2d 231 (1960).

6. 393 U.S. at 509, 89 S.Ct. at 738, quoting Burnside v. Byars, 363 F.2d 744, 749 (5th Cir. 1966).

7. 393 U.S. at 513, 89 S.Ct. at 740; see Pred v. Board of Public Instruction, etc., *supra*, 415 F.2d at 859.

that would render it obscene either under the standards of Roth v. United States,[8] or under the stricter standards for minors as set forth in Ginsberg v. New York.[9]

The slang words are contained in two short rhymes which are less ribald than those found in many of Shakespeare's plays. The reference in the story to an act of sexual intercourse is no more descriptive than the rape scene in Pope's "Rape of the Lock". As for the theme of the story, the Court notes that the anthology in which the story was published was reviewed by several of the popular national weekly magazines, none of which found the subject matter of any of the stories to be offensive. It appears to the Court, moreover, that the author, rather than advocating the "killing off of old people," satirizes the practice to symbolize the increasing depersonalization of man in society.

■ The Court's finding as to the appropriateness of the story for high school students is confirmed by the reaction of the students themselves. Rather than there being a threatened or actual substantial disruption to the educational processes of the school, the evidence reflects that the assigning of the story was greeted with apathy by most of the students. Only three of plaintiff's students asked to be excused from the assignment. On this question of whether there was a material and substantial threat of disruption, the Principal testified at the School Board hearing that there was no indication that any of plaintiff's other 87 students were planning to disrupt the normal routine of the school. This Court now specifically finds and concludes that the conduct for which plaintiff was dismissed was not such that "would materially and substantially interfere with" reasonable requirements of discipline in the school.

8. 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

9. 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed. 2d 195 (1968).

A recent First Circuit case lends further support to this Court's conclusion. There a high school teacher was suspended for assigning and discussing a magazine article which contained several highly offensive words. The court, finding the article to be well-written and thought-provoking, formulated the issues thusly,

> Hence the question in this case is whether a teacher may, for demonstrated educational purposes, quote a "dirty" word currently used in order to give special offense, or whether the shock is too great for high school seniors to stand. If the answer were that the students must be protected from such exposure, we would fear for their future. We do not question the good faith of the defendants in believing that some parents have been offended. With the greatest of respect to such parents, their sensibilities are not the full measure of what is proper education.[10]

■ Since the defendants have failed to show either that the assignment was inappropriate reading for high school juniors, or that it created a significant disruption to the educational processes of this school, this Court concludes that plaintiff's dismissal constituted an unwarranted invasion of her First Amendment right to academic freedom.

## II

Plaintiff also alleges that she was denied "the right to use the short story in question as extra reading without a clear and concise written standard to determine which books are obscene."

■ The record shows that prior to plaintiff's dismissal, there was no written or announced policy at Jefferson Davis High School governing the selection

10. Keefe v. Geanakos, 418 F.2d 359, 361–362 (1st Cir. 1969).

and assignment of outside materials. One of the defendants testified at the School Board hearing that the selection of outside readings was a matter determined solely by the good taste and good judgment of the individual teacher. The only question before this Court on this point, therefore, is whether plaintiff was entitled, under the Due Process Clause, to prior notice that the conduct for which she was punished was prohibited.[11]

Our laws in this country have long recognized that no person should be punished for conduct unless such conduct has been proscribed in clear and precise terms. See Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). When the conduct being punished involves First Amendment rights, as is the case here, the standards for judging permissible vagueness will be even more strictly applied.[12]

In the case now before the Court, we are concerned not merely with vague standards, but with the total absence of standards. When a teacher is forced to speculate as to what conduct is permissible and what conduct is proscribed, he is apt to be overly cautious and reserved in the classroom.[13] Such a reluctance on the part of the teacher to investigate and experiment with new and different ideas is anathema to the entire concept of academic freedom.

This Court is well aware of the fact that "school officials should be given wide discretion in administering their schools" and that "courts should be reluctant to interfere with or place limits on that discretion." Such legal platitudes should not, however, be allowed to

become euphemisms for "infringement upon" and "deprivations of" constitutional rights. However wide the discretion of school officials, such discretion cannot be exercised so as to arbitrarily deprive teachers of their First Amendment rights. See Johnson v. Branch, *supra,* 364 F.2d at 180. This Court cannot, on the facts of this case, find any substantial interest of the schools to be served by giving defendants unfettered discretion to decide how the First Amendment rights of teachers are to be exercised. Cf. Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 328, 95 L.Ed. 267, 280 (1951).

It should be emphasized, however, that because of the special circumstances present in this case this Court does not feel any necessity to comment upon the advisability of requiring school administrators to promulgate rules and regulations under any other circumstances.

### III

The English Department at Jefferson Davis High School publishes "English Reading Lists" for the benefit of its teachers and students. Each list (the lists are compiled separately for each grade) contains the names of approximately twenty-five recommended works.

One of the recommended novels on the "Junior English Reading List" is J. D. Salinger's *Catcher in The Rye.* This novel, while undisputedly a classic in American literature, contains far more offensive and descriptive language than that found in plaintiff's assigned story. The "Senior English Reading List" contains a number of works, such as Huxley's

---

11. Since the court has found earlier in this opinion that plaintiff's conduct was constitutionally protected, that is, was not "hard-core", she has standing to raise this Due Process question. Cf. Dombrowski v. Pfister, 380 U.S. 479, 491–492, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

12. NAACP v. Button, 371 U.S. 415, 432, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963);

Winters v. New York, 333 U.S. 507, 509–510, 68 S.Ct. 665, 92 L.Ed. 840 (1948); see Brooks v. Auburn University, 296 F. Supp. 188 (M.D.Ala.), aff'd, 412 F.2d 1171 (5th Cir. 1969).

13. Cf. Keyishian v. Board of Regents, etc., *supra,* 385 U.S. at 604, 87 S.Ct. 675.

*Brave New World* and Orwell's *1984* which have highly provocative and sophisticated themes. Furthermore, the school library contains a number of books with controversial words and philosophies.

This situation illustrates how easily arbitrary discrimination can occur when public officials are given unfettered discretion to decide what books should be taught and what books should be banned. While not questioning either the motives or good faith of the defendants, this Court finds their inconsistency to be not only enigmatic but also grossly unfair.[14]

With these several basic constitutional principles in mind it inevitably follows that the defendants in this case cannot justify the dismissal of this plaintiff under the guise of insubordination. The facts are clear that plaintiff's "insubordination" was not insubordination in any sense and was not, in reality, a reason for the School Board's action. Dickey v. Alabama State Board of Education, 273 F.Supp. 613 (D.C.).

In accordance with the foregoing, it is the order, judgment and decree of this Court that the plaintiff be reinstated as a teacher for the duration of her contract, with the same rights and privileges which attached to her status prior to her illegal suspension.

It is further ordered that plaintiff be paid her regular salary for both the period during which she was suspended and for the remaining period of her contract.

It is further ordered that defendants expunge from plaintiff's employment records and transcripts any and all references relating to her suspension and dismissal.

It is further ordered that the court costs incurred in this cause be and they are hereby taxed against the defendants.

14. See Keefe v. Geanakos, *supra*, 418 F.2d at 362; Vought v. Van Buren Public Schools, 306 F.Supp. 1388, 1395–1396 (E.D.Mich.1969).