Accordingly, plaintiff's complaint will be dismissed.

Bob CARY et al., Plaintiffs,

v.

BOARD OF EDUCATION OF the AD-AMS–ARAPAHOE SCHOOL DISTRICT 28–J, AURORA, COLORADO, et al., Defendants.

Civ. A. No. 76 M 200.

United States District Court, D. Colorado.

March 3, 1977.

Charles W. Newcom and Susan D. Proctor, Denver, Colo., Joan S. Brett, Boulder, Colo., for plaintiffs.

Eugene F. McGuire, Wiley E. Mayne, Jr., and Richard G. Caldwell, Holland & Hart, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

This case has been submitted on stipulated facts with both plaintiffs and defendants moving for summary judgment.

### AGREED FACTS

Each of the plaintiffs is a senior high school English teacher employed by the defendant school district under a tenure system established by state statute. The plaintiffs have taught or are teaching elective courses designated as "Contemporary Literature," "Contemporary Poetry," and "American Masters" for eleventh and twelfth grade students, using contemporary literature and poetry as course material.

Three of the plaintiffs have structured these courses to permit the students to select almost all of the material to be read, individually. The others teach the same courses but assign most of the reading, with some electives. All of these teachers use group and class discussion of the books and poems read by the students.

The individual defendants are the incumbent members of the Board of Education governing Adams-Arapahoe School District 28–J. In Colorado, school board members are elected at regularly scheduled elections for fixed terms of office, and they are also subject to recall at a special election initiated by petition. With some exceptions, which are not relevant here, local school districts in Colorado are autonomous in the control and management of their public schools through twelfth grade.[1] Colorado also has a compulsory attendance law which requires all persons to attend public schools from age seven to their sixteenth birthday, with certain statutory exceptions.[2]

In January, 1975, the defendants formed a committee of teachers, students, parents and school board members, called the "High School Language Arts Text Evaluation Committee" to review text material. That committee met publicly, solicited comments from the public, and submitted a report on January 6, 1976. A minority report was also submitted.

At a regularly scheduled public meeting on January 12, 1976 the defendants, by a majority vote, approved a list of 1275 textbooks for use in the high schools and they disapproved the following ten books:

*A Clockwork Orange* by Anthony Burgess
*The Exorcist* by William P. Blatty
*The Reincarnation of Peter Proud* by Max Ehrlich
*New American Poetry* by Donald Allen
*Starting from San Francisco* by Lawrence Ferlinghetti
*The Yage Letters* by William Burroughs and Allen Ginsberg
*Coney Island of the Mind* by Lawrence Ferlinghetti
*Kaddish and Other Poems* by Allen Ginsberg
*Lunch Poems* by Frank O'Hara
*Rosemary's Baby* by Ira Levin

Each of these books had been included in reading lists used by the plaintiffs in their courses and none of them has been ordered removed from the school libraries.

The parties agreed that these ten books are not legally obscene; that they do not

---

1. See Colo. Const. art. IX, § 15 and Colo.Rev. Stat. 22–32–101 *et seq.* (1973).

2. See Colo.Rev.Stat. 22–33–104 (1973).

represent any system of thought or philosophy; and that the exclusion of these books could not be considered to be an abuse of discretion or otherwise contrary to any constitutional standards applicable to an appropriate decision-maker.

On January 13, 1976, the school board issued a memorandum, directing that the subject ten books "will not be purchased, nor used for class assignment, nor will an individual be given credit for reading any of these books." That memorandum also cautioned that any materials not included in the approved list of books could be used in the subject courses only with prior approval of the Division of Instructional Services. At all times the plaintiffs and defendants have followed a policy of permitting students, with parental approval, to request alternatives to assignments of material which offends them.

The Aurora Education Association (AEA), a non-profit Colorado corporation, acting as the representative of all teachers employed in the defendant school district, conducted negotiations with the school board, resulting in a collective bargaining agreement, dated February 13, 1976, effective for the years 1975–1978. One item of disagreement during those negotiations was the issue of final authority on matters relating to curriculum and selection of instructional material. The initial AEA proposal provided for final determination of questioned materials by a committee of the Teachers Advisory Council. It also provided that the recommendations of the Teachers Advisory Council could be rejected by the school board only for "good and just cause shown."

That proposal was rejected and the provisions agreed upon in the signed agreement include the following:

*Academic Freedom* —The parties seek to educate young people in the democratic tradition, to foster a recognition of individual freedom and social responsibility, to inspire meaningful awareness of and respect for the Constitution and the Bill of Rights.

Freedom of individual conscience, association, and expression will be encouraged and fairness in procedures will be observed both to safeguard the legitimate interests of the schools and to exhibit by appropriate examples the basic objectives of a democratic society as set forth in the Constitution of the United States and the State of Colorado.

The final responsibility in the determination of the above rests with the Board.

Article V, "Board Rights", at pages 7–8 of the agreement, provides that the board shall have the right to "[d]etermine the processes, techniques, methods and means of teaching any and all subjects."

The collective bargaining agreement includes a grievance procedure, with non-binding arbitration.

Each of the plaintiffs is an active member of the AEA. Mr. Bridgeman is now on leave from his teaching duties to serve as president of that organization.

The professional judgment of the plaintiffs is that the ten excluded books should be available for use in teaching the subject courses.

The defendants agree that the following activities by the plaintiffs would be a violation of the January 13, 1976 directive:

(a) Adding any of the subject textbooks to the reading list in their courses;

(b) Assigning the reading of any of the subject textbooks;

(c) Giving any student any credit in courses for reading any of the subject textbooks;

(d) Reading aloud or causing to be read aloud any of the subject textbooks in the classroom during class time;

or (e) Discussing with students in the classroom during class time any of these materials at such length so as to amount to a constructive assignment of the materials.

## JURISDICTION

The plaintiffs claim that the action of the defendants in prohibiting the use of these

ten books as instructional material raises a federal question because it constitutes an infringement of academic freedom. More specifically, the plaintiffs assert that they have a constitutionally-protected right to select teaching materials for these elective courses for the eleventh and twelfth grades on the basis of their professional judgment as to the appropriateness of the materials for the subject of the courses and the ability of the students. The logical extension of plaintiffs' contention is that they can teach without accountability to their employer.

The defendants contend that there is no constitutional right in issue. Their position is that because public high schools are a governmental activity the courses and material taught are directly subject to the control of the representatives chosen through the electoral process to manage and supervise that activity. Thus, a majority or plurality of the electorate may control course content, so long as that control is not exercised in some manner which would be subject to some other recognized constitutional limitation, as, for example, an infringement of the establishment of religion clause or perhaps a violation of substantive due process, neither of which is involved here. The logical extension of defendants' contention is that they have the power to cause teachers to teach from a prepared script.

The initial question for consideration is whether the right claimed by the plaintiffs exists under the Constitution. If it does, there is jurisdiction to determine whether these facts constitute an infringement of it. As to the individual defendants, 28 U.S.C. § 1343 and 42 U.S.C. § 1983 provide the basis for jurisdiction, and for all defendants there is jurisdiction to consider the constitutional question under 28 U.S.C. § 1331 because, ultimately, the teachers' jobs are at stake and they are worth more than $10,-000.00. However, if there is no such right, there is no jurisdiction.

Certainly there is no language in the First Amendment or in any other provision of the Constitution which explicitly recognizes a specific freedom to teach. Underlying the entire Constitution is the philosophy that communicated thought must be protected from governmental control. The First Amendment references to freedom of speech and of the press are designed to assure the free exchange in the general marketplace of ideas. Academic freedom, it can be argued, is the adaptation of those specific constitutional rights to protect communication in the classroom as a special market place of ideas. As Justice Brennan observed in *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967),

> Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. . . . The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection." *United States v. Associated Press,* 52 F.Supp. 362, 372.

Most of the discussion of academic freedom, including Justice Brennan's observation above, has been in the context of higher education. Chief Justice Warren wrote that "[t]he essentiality of freedom . . . is almost self-evident" and "[t]o impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation." *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, at 1211, 1 L.Ed.2d 1311 (1957). These and many other statements from the Supreme Court reflect such a widely held belief and traditional view that it is unlikely that a board of regents or other public authority would even attempt to deny a college professor the authority and responsibility to select the materials to be used in his classes. Such an attempt would quite clearly be a case within federal question jurisdiction.

It is not so clear that there is a constitutional basis for the claimed right which would establish such jurisdiction in the context of high school education. Plaintiffs have cited two opinions which recognize some degree of academic freedom at the high school level in circumstances similar to those of the present case.

In *Parducci v. Rutland,* 316 F.Supp. 352 (M.D.Ala.1970), the trial court held that a high school teacher's dismissal for assigning a Kurt Vonnegut story to her English class, contrary to the instruction of the school board, constituted an unwarranted invasion of her First Amendment right to academic freedom. The court's analysis began with Justice Brennan's statement on academic freedom in *Keyishian, supra.* Assuming, without discussing, its applicability to the high school classroom, the court noted that "[t]he right to academic freedom . . . like all other constitutional rights, is not absolute and must be balanced against the competing interests of society." 316 F.Supp. at 355. The trial judge then proceeded to decide whether the subject short story was appropriate reading for high school students. Finding that the story was neither inappropriate nor a cause of disruption to the educational process, the court concluded that the plaintiff's right to academic freedom had been infringed.

In *Keefe v. Geanakos,* 418 F.2d 359 (1st Cir. 1969), the appellate court held that a high school teacher was entitled to a preliminary injunction preventing a discharge hearing because he was likely to prevail on his claim that academic freedom entitled him to assign reading of an *Atlantic Monthly* magazine article and to discuss its use of a controversial word in his English class of senior students. As in *Parducci,* the existence of academic freedom in high school was assumed although "some measure of public regulation" was also recognized. Again, as in *Parducci,* the specific controversy was resolved by the court's findings that the article was scholarly and thought-provoking; that the article, when properly understood, would reject rather than suggest use of the controversial word; and

that the controversial word was hardly unknown to students in their last year of high school.

■ *Parducci* and *Keefe* are of limited value here, for two reasons. First, the existence of the constitutional right of academic freedom in the high school context is not self-evident. Secondly, assuming there is jurisdiction by virtue of some constitutional protection, I reject the approach that this kind of controversy can be resolved by a judicial review of the quality or character of the communications involved. The courts must not assume the role of arbiters of the appropriateness of material for use in a classroom. To force parents, teachers, students, administrators and school boards to obey the dictates of a judge would be wholly inimical to the interests of a free society and it would be yet another step toward the authoritarianism of a judicial oligarchy. The institutional role of the court is to determine whether the Constitution controls who has the authority to choose in a given context, and what are the constitutional limitations on the power of the decision-maker. The quality of the decision is irrelevant.

The cases cited by defendants are also of limited value. In *Presidents Council v. Community School Board,* 457 F.2d 289 (2d Cir. 1972), *cert. den.* 409 U.S. 998, 93 S.Ct. 308, 34 L.Ed.2d 260 (1972), the court held that a school board's decision to remove a book from junior high school libraries did not violate the First Amendment rights of either teachers or students. The court did not deny that academic freedom is a recognizable right in high school. It simply found that the intrusion of the board upon any First Amendment right was minuscule because the book was readily available in other libraries, and teachers were not precluded from discussing it in class or assigning it for outside reading. Consequently, there was no showing of a curtailment of freedom of speech or thought. *Presidents Council* does nothing to determine the question of the applicability of academic freedom to high school, and it is factually distinguishable from the present case.

*Minarcini v. Strongsville City School Dist.,* 384 F.Supp. 698 (N.D.Ohio 1974), another case cited by defendants, is much like *Presidents Council.* In *Minarcini,* the trial court held that a school board's refusal to purchase three novels, recommended by the English teachers, did not infringe any right of students to learn. Again, unlike the present case, the teachers were not precluded from discussing the books in class or assigning them as outside or supplemental reading. The holding was simply that the Constitution did not compel the board to purchase the books for classroom use.

While that conclusion was affirmed on appeal, the Sixth Circuit reversed the trial court's dismissal of the complaint concerning an order removing the books from the library. *Minarcini v. Strongsville City School Dist.,* 541 F.2d 577 (6th Cir. 1976). The appellate court read *Presidents Council* narrowly and, after concluding that the removal decision must have been based upon the board members' distaste for the subject matter, the court said:

> A public school library is also a valuable adjunct to classroom discussion. If one of the English teachers considered Joseph Heller's *Catch 22* to be one of the more important modern American novels (as, indeed, at least one did), we assume that no one would dispute that the First Amendment's protection of academic freedom would protect both his right to say so in class and his students' right to hear him and to find and read the book. Obviously, the students' success in this last endeavor would be greatly hindered by the fact that the book sought had been removed from the school library. The removal of books from a school library is a much more serious burden upon freedom of classroom discussion than the action found unconstitutional in *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).
>
> 541 F.2d at 582.

These and the other cases cited by both plaintiffs and defendants do not deal directly with the question of whether the consti-

tutionally-recognized right to academic freedom has any applicability in the context of public high school.

In *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the Supreme Court, speaking through Justice Fortas, recognized the responsibility of the courts to protect freedom in education:

> Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. On the other hand, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools," *Shelton v. Tucker,* 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960).
>
> 393 U.S. at 104, 89 S.Ct. at 270.

Is there a direct implication of basic constitutional values in the defendants' exclusion of these ten books from these elective high school courses? To achieve an appropriate focus on this question it is both necessary and appropriate to consider the role of elementary and secondary public education in the United States. The parties in this case defined that role themselves in the statement on academic freedom, quoted above, in their collective bargaining agreement. A paraphrase of it is that the purpose of public education is to prepare human beings for functioning in our open and complex society. The importance of freedom of expression to the achievement of that objective was forcefully emphasized by Justice Jackson in *Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943):

> The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional free-

doms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

319 U.S. at 637, 63 S.Ct. at 1185.

Having by force of law removed the child from the home to the school room at an early and vulnerable age, the governmental authority has a corresponding responsibility towards the parental authority to insure that the learning experience in the elementary school is consistent with the prevalent view of the community as to what are the basic values, concepts and skills. There is no constitutional purpose in giving an elementary school teacher a greater power to decide what will be taught than that which is shared by all other citizens. The only appropriate decision-makers are the representatives chosen by and accountable to the community.

The defendants assert that same authority over secondary education. They urge the views expressed by Stephen R. Goldstein in his article, "The Asserted Constitutional Right of Public School Teachers to Determine What They Teach," 124 U.Pa.L. Rev. 1293 (1976).

Professor Goldstein apparently believes that the function of all public education is the implantation of a set of societal values, and therefore, decisions about what is to be taught in those schools are community decisions to be made through the democratic process. Under this view, teachers are not considered to be different from any other kinds of employees in the nature and extent to which they are subject to employer control. Professor Goldstein's analysis of the case authority is that the courts have simply recognized that such controls must be job related and that those who teach should share in the exercise of the individual freedoms of expression which are the right of all other citizens. Indeed, in his article, "Academic Freedom: Its Meaning and Underlying Premises as Seen Through the American Experience," 11 Is.L.Rev. 52 (1976), the professor apparently sees no difference between levels of education. All teachers are, essentially, extensions of their employers.

The perception of the educational function as the propagation of predominant views generates some logical inconsistency. Since teachers are obviously role models for their students, their positions as the implanters should lead to the conclusion that they must follow these majoritarian principles at all times because it is difficult to distinguish between public and private conduct of those who are in positions of authority. Accordingly, the individual is submerged for the common good.

That view is the essence of tyranny, because it imposes a collectivist control on the individual's thoughts and actions. The tyranny of the majority is as contrary to the fundamental principles of the Constitution as the authoritarianism of an autocracy. Consider the possibility that the plurality in a given community may decidedly differ from the national majoritarian principles. What would be the reaction to a school board's decision to teach nothing but Maoism in the public schools? Can there be any teacher dissent to that societal value if it is representative of the plurality of the voting electorate in a given school district? Professor Goldstein's employer-employee educational model would deny it. A freedom of communication construct would give an opportunity for challenge with the expression of differing values.

While the eloquent statements of the Supreme Court may have been made in the context of higher education, and even there may be technically characterized as dicta, that does not destroy their importance in providing a philosophical guidance in this case. The ultimate objective of education was well expressed by Justice Frankfurter concurring in *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952),

It is the special task of teachers to foster those habits of open-mindedness and critical inquiry which alone make for responsible citizens, who, in turn, make possible an enlightened and effective public opinion. Teachers must fulfill their function by precept and practice, by the very at-

mosphere which they generate; they must be exemplars of open-mindedness and free inquiry. They cannot carry out their noble task if the conditions for the practice of a responsible and critical mind are denied to them.

344 U.S. at 196, 73 S.Ct. at 221, concurring opinion.

Understanding that the end of education is the formation of responsible citizens who can function in an open society and that some initial indoctrination is only a necessary means to that end, where in the developmental process are upper-level high school students likely to be? Are open access to thought and the freedom to interact with uncontrolled, self-directed teachers required for them?

The parties in this case claim the power of decision as an absolute and they have argued the question on an "either-or" basis. To attempt such an answer would require a similar "either-or" characterization of the nature and purpose of secondary education; either it is to inculcate values and teach basic skills in a controlled environment, or it is to provide an opportunity for free development and exchange of ideas.

I suggest that secondary schools involve a mixture of these elements in the progression toward the ultimate goal of education. As the student advances in age, experience, information, and skills, the need for controlling the educational environment diminishes. Assuming an adequate initiation into the fundamentals, the secondary school student must be given an opportunity to participate openly if he is to become the kind of self-controlled, individually-motivated and independent-thinking person who can function effectively as a contributing citizen in a society of ordered liberty.

For many people, the formal educational experience ends with high school. To restrict the opportunity for involvement in an open forum for the free exchange of ideas to higher education would not only foster an unacceptable elitism, it would also fail to complete the development of those not going on to college, contrary to our constitutional commitment to equal opportunity.

Effective citizenship in a participatory democracy must not be dependent upon advancement toward college degrees. Consequently, it would be inappropriate to conclude that academic freedom is required only in the colleges and universities.

The Aurora school board has shown its commitment to providing its upper-level students with an opportunity to engage actively in the free exchange of ideas. Specifically, the fact that the courses here are offered as electives indicates the board's recognition that the students have already been initiated into the basics and are prepared to participate critically and creatively. I do not hold that a school board has any obligation to create an open environment in any school. It is enough to conclude that having granted both teachers and students the freedom to explore contemporary literature in these high school classes, the school board may not now impose its value judgments on the literature they choose to consider.

In addressing a specific issue involving academic freedom, it is necessary to consider the purpose of the particular educational process in which it arises. The question is best phrased by asking whether the course objectives and the skill levels of the students are characterized as being within the implantation or indoctrination stage; or whether the teachers and students involved have become a part of the open, participatory community. In this case, that question was answered by the board of education when the students were given the freedom of choice as to these courses. Consequently, the claims of the plaintiffs do generate a substantial question arising under the First and Fourteenth Amendments to the United States Constitution and this court has jurisdiction.

### ACADEMIC FREEDOM

This case involves the issue of academic freedom in its purest form. The plaintiffs are not seeking to avoid restriction of any rights which they share with all other citizens. They are asserting a freedom pecu-

liar to their positions as teachers. While such a right has been recognized here, for jurisdictional purposes, as a specific application of the general freedom of communication protected by the First Amendment, it is now important to acknowledge limitations in its scope and the manner of its exercise.

Teachers are employees who do not differ from other employees in their obligations to the employers in matters involving the administration and operation of the place of employment. Maintaining the schools as a special marketplace of ideas does not require the immunization of teachers from such controls as school boards exercise in common with other kinds of employers.

What separates teachers from production workers is the difference in the products which are the end results of their efforts. While an automobile manufacturer can compel adherence to such directions as may be necessary to make uniform models of vehicles according to strict design specifications, there can be no comparable power for a school board to design and specify uniformity in the graduates of its schools.

■ Academic freedom as the protection of open communication in the processes of teaching does not restrict the public authority to control the educational program and the place where it occurs. We will have such schools operating at such times and places with such curricula as the elected representatives of the people shall determine; but involuntary restrictions on the individual liberty of teachers and students to communicate, directly and indirectly, where such open expression is consistent with the attained level of educational development, are matters of constitutional concern.

The application of the employer-employee model to the conduct of the teachers was the implicit basis for the restrictions recognized by the Tenth Circuit in *Adams v. Campbell County School District,* 511 F.2d 1242 (10th Cir. 1975). There the trial court found and the circuit court affirmed that the reasons for non-renewal included insubordination (refusal to follow principal's in-

structions to send students to assembly), failure to maintain student discipline, failure to devote sufficient class time to subject of course, and cliquishness which alienated plaintiffs from the other teachers and undermined faculty morale. Other intramural conduct and activities of the plaintiffs which might have fallen within the protection of academic freedom were found as a matter of fact not to have been the reasons for non-renewal.

Additional cases which illustrate appropriate employer authority over teacher conduct include excessive counseling of students rather than referring them to the professional counseling staff, *Clark v. Holmes,* 474 F.2d 928 (7th Cir. 1972); and failure to arrive for work promptly, *Knarr v. Board of School Trustees,* 317 F.Supp. 832 (N.D.Ind.1970), aff'd., 452 F.2d 649 (7th Cir. 1971). Additional examples would include failure to follow and enforce safety rules, failure to fulfill administrative obligations, and failure to meet minimum quantitative requirements of an assigned curriculum in such skills courses as mathematics.

■ What amount of restriction may be imposed upon a teacher's extramural activity is not a proper subject of inquiry here. Accordingly, cases which are concerned with that question are not applicable authorities. It is sufficient to say that while teachers have the same rights of other employees to be free from restraints on non-employment related speech or conduct, *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), it is difficult to determine what is or is not work related in the context of the indoctrination phase of education at the elementary level. In *Sullivan v. Meade Independent School Dist. No. 101,* 530 F.2d 799 (8th Cir. 1976), an unmarried elementary school teacher in a very small town was discharged because she insisted upon sharing her dwelling, located within the school community, with a single man. The school board's justifications for the discharge were (1) that the conduct set a "bad example" for impressionable young children, (2) that community reaction to the conduct would

preclude the teacher from generating necessary cooperation and support, and (3) that the children's awareness that the conduct was considered wrong by parents would impair her ability to maintain classroom discipline.

The teacher's liberty is not a license, either as formalized authority or as an undisciplined freedom, and limitations on the manner of its exercise are required to achieve the purpose of academic freedom. Because that purpose is the protection of open communication as a fundamental requirement for a free society, the correlative rights of the other participants in the educational enterprise must be recognized. For a teacher to abuse the prestige or authority of his position to advance his own personal views or suppress those of a student, parent, or any other member of the community would be as stifling to the goal of free exchange and inquiry as an infringement on the teacher's own liberty. The point is illustrated in *Knarr v. Board of School Trustees, supra,* in which the court held that a school board can terminate a teacher for abuse of his teaching position by using his classroom "as his personal forum" and belittling students who challenge his opinions.

Additionally, there must be a sufficient stability in the structure of the enterprise to permit orderly interaction. That students' freedom of speech and expression in the academic context cannot be exercised in a manner which interferes with the work of the schools or with the rights of other members of the school community was clearly expressed by the Supreme Court in *Tinker v. Des Moines School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). A teacher's liberty to teach is subject to the same limitation. That was the basis for the decision in *Peterson v. School District,* Civil No. 75–M–10 (D.Colo. April 9, 1976), in which I held that a teacher could be discharged for the use of an innovative graffiti exercise which turned into a verbal personal attack upon the junior high school principal.

These limitations on the exercise of academic freedom can be summarized with the observation that this freedom must always be tempered by professional responsibility. The only justification for restricting this individual freedom is that the particular conduct or activity is inconsistent with or counterproductive to the objective of producing effective citizens. It is the same constitutional purpose of maintaining a society of ordered liberty which creates both the right and the responsibility.

CONCLUSION

The collective bargaining agreement is the central fact in this case. That is what alters the controversy from the abstraction of academic freedom to the specific commitment of a contractual obligation. Through the AEA the teachers in the defendant school district have elected to surrender their individual freedom of professionalism for the security of protectionism by collective action and a group contract. In so doing, they have voluntarily submitted themselves to the employer-employee model of the teacher's relationship to the school board for everything which is within the scope of the contract and that includes the authority to control communication through the assignment of reading material.

But for the bargained agreement, the plaintiffs would prevail here. The selection of the subject books as material for these elective courses in these grades is clearly within the protected area recognized as academic freedom. Additionally, the school board's policy directive of January 13, 1976, prohibiting the use of any material not included in the list of 1275 books without first obtaining approval of the Division of Instructional Services is the kind of broad prior restraint which is particularly offensive to First Amendment freedom.

Because of the bargained agreement, the plaintiffs' claims must be denied. Whatever may be the scope of the protection of the First and Fourteenth Amend-

ments for a freedom to communicate with students, directly in classroom speech or indirectly through reading assignments, such protection does not present a legal impediment to the freedom to contract. Thus, a teacher may bargain away the freedom to communicate in her official role in the same manner as an editorial writer who agrees to write the views of a publisher or an actor who contracts to speak the author's script. One can, for consideration, agree to teach according to direction.

The combination of teachers into bargaining units with the coercive power of group action is a contradiction of the kind of individual freedom protected by the First Amendment. Conformity to the consensus of a peer group is the essence of a labor organization, and if teachers seek to enjoy the benefits of such concert they must respect the contract which results from the bargaining process and the rights which it gives to the employer. Teachers may elect to subject themselves to employer control through such contracts and thereby abandon the protection of their professionalism. Here the plaintiffs are acknowledged members of the AEA and that organization, acting as their agent, has yielded final authority to the Board of Education for the choice of instructional material. Each of these plaintiffs is bound by that agreement and none of them can act in contradiction of it. In full context, that contract says that while the school board agrees to respect their professional views, in the event of a conflict the Aurora teachers will accept the directions of their employer. The plaintiffs are bound by that commitment and they may not now seek to avoid it by calling upon a constitutional freedom to act independently and individually. Accordingly, it is concluded that the action of the defendants was taken pursuant to contractual authority and does not infringe upon any rights of plaintiffs. It is therefore,

ORDERED, that the defendants' motion for summary judgment is granted, and judgment shall enter for the defendants with costs to be taxed.