BOARD OF TRUSTEES OF HAMILTON HEIGHTS SCHOOL CORPORATION, Ronald E. McGill, Sylvia Kay Hartley, Marcia A. House, Keith Schulenberg, and Laurence C. Beck, Individually and in their capacity as members of the Board of School Trustees of Hamilton Heights School Corporation, Appellants–Defendants,

v.

Roger V. LANDRY, Appellee–Plaintiff.

No. 06A01–9112–CV–380.

Court of Appeals of Indiana, First District.

Aug. 11, 1994.

Rodney V. Taylor, David J. Theising, Christopher & Taylor, Indianapolis, Steven A. Holt, Holt, Fleck & Free, Noblesville, for appellants.

Richard J. Darko, Mary Jane Lapointe, Lowe Gray Steele & Hoffman, Indianapolis, for appellee.

## OPINION ON REHEARING

NAJAM, Judge.

 In our previous opinion, *Board of Trustees of Hamilton Heights School Corporation v. Landry* (1993), Ind.App., 622 N.E.2d 1019, Hamilton Heights brought an interlocutory appeal from the trial court's denial of its motion for summary judgment on Landry's federal law claims. Landry had alleged infringement of his right of academic freedom and a denial of due process when Hamilton Heights suspended him for two days without pay and required him to make restitution after he permanently removed the glossaries from 146 science textbooks owned by the school. Without reaching his substantive claims, we held that Landry could not maintain a Section 1983 action against Hamilton Heights because "an Indiana school corporation is not a 'person' under 42 U.S.C. § 1983." *Id.* at 1025. However, after a more thorough briefing of this issue by the parties, and our additional research and further consideration, we now conclude that an Indiana school corporation is not an arm of the state entitled to Eleventh Amendment immunity and, therefore, that Hamilton Heights is a "person" amenable to suit under Section 1983.

### Issue One: School Corporation's Status Under Section 1983

We applied an Eleventh Amendment immunity analysis in our previous opinion to determine whether Hamilton Heights was a "person" amenable to suit under Section 1983. *See Landry,* 622 N.E.2d at 1023; *Will v. Michigan Department of State Police* (1989), 491 U.S. 58, 71, 109 S.Ct. 2304, 2311–12, 105 L.Ed.2d 45, 58. There, our inquiry relied upon the Indiana Constitution, and Indiana statutory and decisional law regarding whether or not a particular entity was an arm of the state. *See Mt. Healthy Bd. of Educ. v. Doyle* (1977), 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471, 479.

We believe that further analysis is necessary. Once again, our discussion must begin by looking to the Supreme Court's decision in *Mt. Healthy.* In *Mt. Healthy,* the Court addressed whether an Ohio school board "is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *Id.* The Supreme Court concluded that an Ohio school board is "more like a county or a city than it is like an arm of the state" and held that the school board was not entitled to Eleventh Amendment immunity from suit in federal courts. *Id.*

■ Eleventh Amendment immunity "depends, at least in part, upon the nature of the entity created by state law." *Id.* The United States Court of Appeals for the Seventh Circuit has interpreted that principle to mean that "the *Mt. Healthy* test for whether an entity is an arm of the state is fact specific." *Gary A. v. New Trier High School Dist. No. 203* (7th Cir.1986), 796 F.2d 940, 945 n. 8. In a decision involving Eleventh Amendment immunity issued shortly after

*Mt. Healthy* was decided, the Seventh Circuit opined that the *Mt. Healthy* test focused primarily on the Ohio school board's authority "to raise its own funds when the need arose," either "by tax levy or by bond issuance," because of concern over who would satisfy a judgment against the school district. *Mackey v. Stanton* (7th Cir.1978), 586 F.2d 1126, 1130–31. The court in *Mackey* also inferred that the Supreme Court found it important that the Mt. Healthy school board performed its duties on a local level, although the board was subject to state supervision and depended heavily on state funds. *Id.* at 1131. Indeed, the Supreme Court's analysis of the Eleventh Amendment issue in *Mt. Healthy* is confined to a brief discussion of these criteria and citations to relevant provisions of the Ohio Code.

Since *Mackey,* the Seventh Circuit has expanded upon the factors the Supreme Court considered in *Mt. Healthy* and has adopted additional factors which we must consider in determining whether an entity, particularly an educational institution, is an arm of the state. The most important factor according to the Seventh Circuit is "the extent of the entity's financial autonomy from the state," specifically "whether a judgment would deplete the state treasury." *Kashani v. Purdue University* (7th Cir.1987), 813 F.2d 843, 845; *Benning v. Bd. of Regents of Regency Universities* (7th Cir.1991), 928 F.2d 775, 777 (citing *Edelman v. Jordan* (1974), 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662).[1]

■ A central concern in assessing the financial autonomy factor is whether an entity has the power to levy taxes and to issue bonds, in order that a judgment may be payed without resort to the general revenues of the state. *See Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. at 572, 50 L.Ed.2d at 480;

---

1. The question "whether a judgment would deplete the state treasury" is also considered the critical inquiry for Eleventh Amendment immunity analysis by the Third, Sixth, Ninth, Tenth and Eleventh Circuits. *See Blake v. Kline* (3rd Cir.1979), 612 F.2d 718, 723; *Hall v. Medical College of Ohio at Toledo* (6th Cir.1984), 742 F.2d 299, 304; *Belanger v. Madera Unified School Dist.* (9th Cir.1992), 963 F.2d 248, 251; *Martinez v. Bd. of Educ. of Taos Municipal School Dist.* (10th Cir.1984), 748 F.2d 1393, 1395–96; *Stewart v. Baldwin County Bd. of Educ.* (11th Cir.1990), 908 F.2d 1499, 1509.

*Kashani,* 813 F.2d at 846; *Gary A.,* 796 F.2d at 945; *Mackey,* 586 F.2d at 1130–31. In Indiana, although local school corporations receive a significant amount of state funding,[2] they also have the power to levy taxes, to issue bonds, and to pay their own judgments.[3] *See* IND.CODE § 20–4–1–26.9; IND.CODE § 20–5–2–2(13); IND.CODE § 20–5–4–1; IND.CODE § 20–5–2–2(16). Thus, an Indiana school corporation possesses the degree of financial autonomy which the Supreme Court in *Mt. Healthy* found supported a determination that a school corporation was not an arm of the state for purposes of Eleventh Amendment immunity.

Among the other factors we must consider in our analysis is "the general legal status of the entity." *Kashani,* 813 F.2d at 846–47 (citing *Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. at 572, 50 L.Ed.2d at 479). This factor involves an examination of "Indiana statutory definitions." *Id.* at 847. A school corporation has been defined by our statutes in at least three instances. First, the definition of "school corporation" includes "any school city, school town, school township, consolidated school corporation, metropolitan school district, township school corporation, county school corporation, united school corporation, or any community school corporation." IND. CODE § 20–6.1–1–5. The Budget Agency Act, at Indiana Code § 4–12–1–2, expressly excludes "cities, towns, townships, school cities, school towns, school townships, school districts, [and] other municipal corporations or political subdivisions of the state" from the definition of a "state agency." In addition, as stated in our previous opinion, the Tort Claims Act provides that a "school corporation" is a "political subdivision." *See* IND. CODE § 34–4–16.5–2. Thus, as in *Mt. Healthy,* these definitions also support the conclusion that a school corporation in Indiana is not an arm of the state.

Finally, we must look to whether the entity at issue can sue and be sued and enter into contracts, and whether it serves the state as a whole or only a local region. *See Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. at 572, 50 L.Ed.2d at 479; *Kashani,* 813 F.2d at 847–48; *Benning,* 928 F.2d at 777. An Indiana school corporation has express statutory authority "to sue and be sued and to enter into contracts." IND.CODE § 20–5–2–2(1). Further, the entity at issue here is but one of many local school corporations in Indiana. Indiana "chose to organize public education through local school districts" instead of establishing "a single state agency to control all public education." *See Gary A.,* 796 F.2d at 945 n. 9. These factors indicate as well that an Indiana school corporation does not have Eleventh Amendment immunity.

We reaffirm that an "inquiry concerning the nature of an Indiana school corporation must begin with the education clause found in Article 8, Section 1, of the Indiana Constitution," and that in the past our courts have properly determined public education to be a central function of state government. *Landry,* 622 N.E.2d at 1023–24. However, we must also acknowledge that Indiana has recently shifted its emphasis from centralized state control of education to greater local autonomy. *See* Brief in Support of Petition for Rehearing at 14. In 1989, the School Corporation Home Rule Act was enacted by the General Assembly to "grant school corporations all the powers that they need for the effective operation of each school corporation." *See* IND.CODE § 20–5–1.5–1. Further, the Act places limitations upon the State's control by providing that "State and other agencies may review or regulate the exercises of powers by a school corporation only to the extent prescribed by statute." *See* IND.CODE § 20–5–1.5–6. Finally, the Home Rule Act abrogated the common law rule that "any doubt as to the existence of a power of a school corporation shall be resolved against its existence." *See* IND. CODE § 20–5–1.5–2; *see also* IND.CODE § 20–5–1.5–3 and 4.

---

**2.** *See* IND.CODE § 20–5–2–2(2.5).

**3.** "It is irrelevant that a state provides *some* funds that may be used to pay judgments." *Gary*

*A.,* 796 F.2d at 945 (citing *Mt. Healthy,* 429 U.S. at 280, 97 S.Ct. at 572) (emphasis added).

Based on our reexamination of Indiana law in light of the Seventh Circuit's interpretation of *Mt. Healthy*, we hold that an Indiana school corporation is not an arm of the state for Eleventh Amendment purposes and, therefore, is not immune from suit under Section 1983.[4] Thus, we must determine whether Landry can maintain a Section 1983 action against Hamilton Heights for an alleged violation of his federally protected constitutional rights.

### Issue Two: Academic Freedom

 As the basis for his Section 1983 claim, Landry asserts that Hamilton Heights deprived him of his First Amendment rights and substantive due process rights.[5] Specifically, Landry claims that Hamilton Heights' imposition of a two-day suspension without pay violated his right of academic freedom.

 The right of academic freedom finds its origins in the First Amendment right of free speech. *See Keyishian v. Bd. of Regents* (1967), 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629, 640. " 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' " *Id.* (quoting *Shelton v. Tucker* (1960), 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231, 236). The First Amendment does not tolerate state action which casts a "pall of orthodoxy" over the classroom.[6] *Id.*

 Here, Landry's purported exercise of his right of academic freedom was his act of removing the glossaries from 146 science textbooks issued to his students by Hamilton Heights. Landry maintains that he removed the glossaries "in order to promote students' learning experiences" and to "force[ ] them to learn the meanings of words from the context, without relying on definitions listed in the glossary." Brief of Appellee at 12. When Hamilton Heights disciplined Landry, however, it disciplined him for his conduct, not for his words. Thus, Landry's exercise of his First Amendment right of academic freedom is not pure speech but is considered "symbolic speech" for the purpose of our analysis.

 The Supreme Court has recognized certain conduct containing a communicative element as "symbolic speech," which may be entitled to protection under the First Amendment. *See United States v. O'Brien* (1968), 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672, 679. However, not all conduct intended to express an idea can be labeled "speech." *Id.; cf.* 4 Ronald D. Rotunda and John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 20.49, at 351–52 (First Amendment does not offer protection for criminal acts committed with a political motive). Symbolic speech is not a constitutionally protected activity where a sufficiently important governmental interest in regulating the conduct justifies limitations on First Amendment freedoms. *See O'Brien,* 391 U.S. at 376, 88 S.Ct. at 1678–79, 20 L.Ed.2d at 679–80. The governmental regulation of symbolic speech is sufficiently justified when: (1) the regulation is within the constitutional power of the Government; (2) it furthers an important or substantial governmental interest; (3) the

---

4. We disagree, however, with Landry's assertion that Judge Barker's recent decision in *Atkins v. Bd. of School Commissioners of the City of Indianapolis* (S.D.Ind.1993), 830 F.Supp. 1169, "directly addresses the issue of whether an Indiana school corporation is a 'person' under § 1983" and, thus, is dispositive in the present case. *See* Brief in Support of Petition for Rehearing at 4. In *Atkins,* the court merely cited *Monell v. Dept. of Social Services* (1978), 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611, 635, but did not consider *Mt. Healthy* or any Seventh Circuit cases on Eleventh Amendment immunity and, thus, assumed without deciding that an Indiana school corporation is a "person" under Section 1983.

5. Landry has expressly waived any claim that his two-day suspension without pay violated his procedural due process rights and, thus, we need not address any procedural due process questions. *See* Brief of Appellee at 20 and 20 n. 4.

6. We assume for purposes of our analysis that an Indiana school corporation such as Hamilton Heights is a state actor. *See May v. Evansville–Vanderburgh School Corp.* (7th Cir.1986), 787 F.2d 1105, 1109.

governmental interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. *Id.* at 377, 88 S.Ct. at 1679, 20 L.Ed.2d at 680.

When the First Amendment claim is a teacher's assertion of his right of academic freedom, courts must balance the teacher's alleged interest in free expression against the educational goals of the school board. *See East Hartford Educ. Ass'n v. Bd. of Educ.* (2d Cir.1977), 562 F.2d 838, 857. "As conduct becomes less and less like 'pure speech' the showing of governmental interest required for its regulation is progressively lessened." *Id.* at 858.

Here, Landry's academic freedom claim, like the teacher's First Amendment claim in *East Hartford,* is "so insubstantial that it borders on the frivolous." *Id.* at 860. Landry's conduct in removing the glossaries from his student's textbooks, while based on a claim of legitimate pedagogical methods, was unlawful. Landry's actions would support charges of Criminal Mischief and Institutional Criminal Mischief, Class B and Class A misdemeanors,[7] respectively, under our criminal code. *See* IND.CODE § 35–43–1–2(a)(1) (recklessly, knowingly or intentionally damaging or defacing another person's property without his consent); IND.CODE § 35–43–1–2(b)(3) and (5) (recklessly, knowingly or intentionally damaging personal property contained in a school). Landry's teaching methods were not verbal expressions which contributed to the "marketplace of ideas" in the classroom and which warranted First Amendment protection. *See Keyishian,* 385 U.S. at 603, 87 S.Ct. at 683, 17 L.Ed.2d at 640. Rather, Landry expressed his pedagogical beliefs through conduct deemed criminal in Indiana.

We agree that Landry had a right of academic freedom in his classroom. Howev-

er, Landry's right was not unfettered. Academic freedom does not include the right to have one's teaching style and methods insulated from review by one's superiors. *See Hetrick v. Martin* (6th Cir.1973), 480 F.2d 705, 709. Indeed, we have previously held that "[a]cademic freedom does not encompass matters inherently destructive of the proper functions of the institution." *Riggin v. Bd. of Trustees* (1986), Ind.App., 489 N.E.2d 616, 630, *trans. denied.*

Thus, while we acknowledge Landry's contention that he had an actual, pedagogical purpose for removing the textbook glossaries, Landry's liberty interest in academic freedom is not a license to destroy school property. *See Cary v. Bd. of Educ.* (D.Colo.1977), 427 F.Supp. 945, 955. Limitations on the manner in which a teacher exercises this right are a recognition of the correlative rights of the other participants in the educational enterprise. *Id.; see Parducci v. Rutland* (M.D.Ala.1970), 316 F.Supp. 352, 355 (right of academic freedom is not absolute and must be balanced against competing interests of society). "These limitations on the exercise of academic freedom can be summarized with the observation that this freedom must always be tempered by professional responsibility." *Cary,* 427 F.Supp. at 955.

As with all Hoosier teachers, Landry's right of academic freedom is limited by the criminal laws of our state just as his professional responsibility as a teacher requires that he comply with those laws. In this case in particular, the criminal laws protect Hamilton Heights' right to be secure in its property, i.e., its textbooks. Hamilton Heights may permissibly take measures, such as the disciplinary action it imposed on Landry, in order to protect the public's property. *See United States v. Eichman* (1990), 496 U.S. 310, 316 n. 5, 110 S.Ct. 2404, 2408 n. 5, 110 L.Ed.2d 287, 294 n. 5 (striking down enforcement of Flag Protection Act as it protected privately owned flags but recognizing Gov-

---

7. These offenses may be enhanced to either a higher misdemeanor offense or to a felony of-

fense depending on the amount of the owner's pecuniary loss.

ernment's interest in protecting publicly owned flags from destruction). On balance, Hamilton Heights' interest in demanding compliance with the law and prohibiting its teachers from damaging textbooks is substantial, indeed compelling, and far outweighs Landry's pedagogical interests.

The standard applied in *Mailloux v. Kiley* (D.Mass.1971), 323 F.Supp. 1387, which Landry cites, does not control the outcome of this case. There, the court established the following rule for academic freedom claims:

> when a secondary school teacher uses a teaching method which he does not prove has the support of the preponderant opinion of the teaching profession or of the part of it to which he belongs, but which he merely proves is relevant to his subject and students, is regarded by experts of significant standing as serving a serious education purpose, and was used by him in good faith the state may suspend or discharge a teacher for using that method but it may not resort to such drastic sanctions unless the state proves he was put on notice either by a regulation or otherwise that he should not use that method.

*Id.* at 1392. "This exclusively procedural protection is afforded to a teacher ... because in his teaching capacity he is engaged in what may plausibly be considered 'vital First Amendment rights.'" *Id.* (quoting *Keyishian*, 385 U.S. at 604, 87 S.Ct. at 684, 17 L.Ed.2d at 641). However, as noted in *Mailloux* and as shown above, a teacher's right to freedom in teaching methods in the classroom "must yield to compelling public interests of greater constitutional significance." *Id.* at 1391 n. 4. A school corporation has a compelling interest in ensuring that the textbooks it purchases with taxpayer money shall not be destroyed, mutilated, damaged or defaced by teachers acting under the guise of academic freedom.

■ Further, there is no concern in this case whether Landry had adequate notice that removing the glossaries from student textbooks would result in disciplinary action. When the conduct being punished involves First Amendment rights, the impermissible conduct must have been proscribed in clear and precise terms. *Parducci,* 316 F.Supp. at 357. Landry was not forced to speculate as to what conduct was permissible and as to what conduct was proscribed. *See id.* All persons are presumed to know the criminal laws. *See Lohm v. State* (1978), 177 Ind.App. 488, 495, 380 N.E.2d 561, 565 (entire citizenry of Indiana deemed to have notice of criminal code).

Thus, unlike the teacher in *Mailloux,* Landry should have known that his teaching method was not permitted. *See Mailloux,* 323 F.Supp. at 1392. In essence, Landry asks that we fashion a rule whereby Indiana school corporations are required to implement and to give notice of a policy that provides which particular criminal conduct by teachers is prohibited before it may discipline its teachers for such misconduct. We decline to do so because Landry's teaching method in this instance constitutes "the kind of unforeseeable outrageous conduct which all men of good will would, once their attention is called to it, immediately perceive to be forbidden." *Id.* at 1392–93. In other words, "it was self-evident that a teacher should not have used the methods followed by [Landry]." *Id.* at 1293. Landry had adequate notice that he might be disciplined for his actions.

■ Our inquiry into the protected status of speech, such as Landry's claim of a right of academic freedom, is a question of law, and not a question of fact for the jury as Landry contends. *See Connick v. Myers* (1983), 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708, 720 n. 7. Therefore, we conclude as a matter of law that Landry does not have a protectable First Amendment right of academic freedom to remove the glossaries from Hamilton Heights' science textbooks. Hamilton Heights' interest in prohibiting the commission of criminal mischief against school property by its teachers far outweighs any pedagogical interest which Landry may claim in using this teaching method.

Accordingly, because Landry has not shown that he was deprived of a fundamental

constitutional right or deprived of a substantive or procedural due process right by Hamilton Heights' disciplinary action, Landry has no claim under 42 U.S.C. § 1983. *See Zinermon v. Burch* (1990), 494 U.S. 113, 115, 110 S.Ct. 975, 983, 108 L.Ed.2d 100, 113–14. The trial court's denial of Hamilton Heights' motion for summary judgment on Landry's federal law claims was erroneous. The trial court's judgment is reversed.

Reversed and remanded.

SHARPNACK, C.J., and BAKER, J., concur.