Anthony S. LENZO, Plaintiff,

v.

SCHOOL CITY OF EAST CHICAGO, Defendant.

No. 2:96–CV–488–TS.

United States District Court, N.D. Indiana, Hammond Division.

Feb. 16, 2001.

James L. Wieser, Jill S. Swope, Wieser & Sterba, Schererville, IN, for Plaintiff.

Terrance L. Smith, Smith and DeBonis, Highland, IN, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPRINGMANN, United States Magistrate Judge.

This matter is before the Court on a Motion for Summary Judgment on Liability as to Defendant School City of East Chicago, filed by the Plaintiff on January 31, 2000. [DE 35] On April 3, 2000, the Defendant filed its Response. [DE 40] On April 18, 2000, the Plaintiff filed his Reply. [DE 42] For the following reasons, the Plaintiff's Motion is GRANTED.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir.1994) (citations and quotation marks omitted). Thus, a summary judgment determination is essentially an inquiry as to "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

No genuine issue of material fact exists for trial where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992). Stated positively, a genuine issue for trial only exists where there is sufficient evidence favoring the non-movant for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249 106 S.Ct. 2505; *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1210 (7th Cir.1993). Furthermore, not every factual dispute creates a barrier to summary judgment; instead, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The inquiry involved in ruling on the motion for summary judgment implicates the substantive evidentiary standard of proof, for example, preponderance of the evidence, that would apply at trial. *Id.* at 252, 254, 106 S.Ct. 2505; *Jean v. Dugan*, 20 F.3d 255, 263 (7th Cir.1994).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may

discharge its "initial responsibility" by simply " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325, 106 S.Ct. 2548; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n. 3 (7th Cir.1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Intern. Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir.1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir.1977). Under Local Rule 56.1, the moving party must file with the court a "Statement of Material Facts," supported by appropriate citation to the record, as to which the moving party contends there is no genuine issue.

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. F.R.C.P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir.1994). Federal Rule of Civil Procedure 56(e) establishes: "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson*, 477 U.S. at 248–50, 106 S.Ct. 2505. Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt

as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348; *Juarez,* 957 F.2d at 322. Under Local Rule 56.1, the party opposing the motion shall file any affidavits or other documentary material controverting the movant's position, including a "Statement of Genuine Issues," supported by appropriate citation to the record, that outlines the material facts that the non-movant contends present genuine issues of fact that must be litigated. *See also Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 922 (7th Cir.1994).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid–America, Inc.,* 45 F.3d 231, 234 (7th Cir.1995); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir.1994); *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1440 (7th Cir.1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Doe,* 42 F.3d at 443. Furthermore, in determining the motion for summary judgment, a court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

## PROCEDURAL BACKGROUND

On September 6, 1994, the Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) in which he alleged that the School City of East Chicago discriminated against him with regard to its Early Retirement Incentive Plan (ERIP) in violation of the Age Discrimination in Employment Act (ADEA). On September 5, 1995, the EEOC issued its Determination, indicating that its examination of the evidence supported the Plaintiff's allegations, that the School City has maintained an ERIP with benefits based upon the age of the participant, that the amount of benefits is reduced based on the age of the retiree, and that there is reasonable cause to believe the School City's policy discriminates against employees on the basis of age. The Determination letter also indicated that the EEOC would attempt to eliminate the discriminatory policies or practices alleged and to obtain voluntary compliance with the requirements of the ADEA through informal methods of conciliation, conference, and persuasion. In a letter dated June 20, 1996, the EEOC indicated to the Plaintiff that it had found reasonable cause to believe that his charge of employment discrimination was true but that it had not entered into a conciliation agreement because attempts to achieve a voluntary settlement with the Defendant had been unsuccessful.

On September 13, 1996, the Plaintiff filed a Complaint in this Court, asserting in Count I an ADEA claim against School City of East Chicago and in Count II an ADEA claim against East Chicago Federation of Teachers Local 511, A.F.T. The Complaint alleged that the Defendants through their ERIP discriminated against the Plaintiff because of his age and that this discrimination resulted in a deprivation of financial and non-financial benefits.

On November 6, 1996, Defendant East Chicago Federation of Teachers Local 511, A.F.T. filed its Answer and asserted affirmative defenses. On November 14, 1996, Defendant School City of East Chicago

filed its Answer and asserted defenses. On February 18, 1997, Defendant Local 511 East Chicago Federation filed an Amended Answer.

On January 31, 2000, Defendant East Chicago Federation of Teachers filed a Motion for Summary Judgment, arguing that the Plaintiff was seeking no relief other than money damages and that as a matter of law money damages are not available against the union. The Plaintiff did not file a response to this Motion for Summary Judgment.

On January 31, 2000, the Plaintiff filed a Motion for Summary Judgment on Liability as to Defendant School City of East Chicago, asserting that no material facts are in dispute, that the Plaintiff has standing to pursue the ADEA claim, that all conditions precedent to suit have been fulfilled, that the Plaintiff has established a prima facie case of disparate treatment in that the express terms of the ERIP in the collective bargaining agreement provide lesser benefits to older teachers because of their age, that Defendant School City cannot prove any statutory defense to its discriminatory ERIP, and that the Plaintiff is entitled to judgment as a matter of law. On April 3, 2000, the Defendant School City filed its Response, asserting that as a subdivision of the State of Indiana it is immune from suit in this Court under the Eleventh Amendment to the Constitution of the United States and thus that this Court has no jurisdiction to enforce the ADEA against it. On April 18, 2000, the Plaintiff filed his Reply, asserting that Defendant School City is not immune under the Eleventh Amendment and, in the alternative, that the application of the Older Workers Benefits Protection Act provides a basis for holding Defendant School City liable.

On June 27, 2000, the Court heard oral argument on the pending motions. At this hearing, the Plaintiff indicated that he did not intend to respond to Defendant East Chicago Federation of Teachers' Motion for Summary Judgment and that he had no objection to the Motion. On July 17, 2000, the Court granted Defendant East Chicago Federation of Teachers' Motion for Summary Judgment, and this cause was dismissed with prejudice as to that Defendant. Thus, Defendant East Chicago Federation of Teachers was terminated as a party.

Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to have this case assigned to a United States Magistrate Judge to conduct any and all further proceedings, including trial, and to order the entry of a final judgment. Accordingly, this Court has the authority to decide the merits of this case.

### MATERIAL FACTS[1]

Anthony S. Lenzo, the Plaintiff, was born on January 22, 1925. He holds a bachelor's degree and a master's degree from Indiana University, and he holds a doctoral degree in educational administration from Nova University. Before beginning his employment relationship with the Defendant, School City of East Chicago, the Plaintiff was employed as a teacher by the Hobart School Corporation for two

---

1. In its Memorandum in Opposition to the Plaintiff's Motion for Summary Judgment, the Defendant states:

    Almost all of the operative facts applicable to the issues raised in the plaintiffs' [sic] Motion for Summary Judgment are not in dispute. The dates and provisions of the Collective Bargaining Agreements entered into between the School City and defendant East Chicago Federation of Teachers, the contents of that agreement, the employment dates and other matters concerning the employment and retirement of plaintiff Anthony S. Lenzo, and the status of the School City as a political subdivision of the State of Indiana are not subject to dispute.

    Def.'s Memorandum at 2.

years and the Gary Community School Corporation for thirteen years. The Plaintiff was employed by the Defendant from July of 1972 until July of 1995. He was hired originally as a full-time Coordinator–Instructional Media. He then worked for four years as an Administrator. He later was employed as a teacher, a position he held until he retired.

The Defendant School City and the East Chicago Federation of Teachers, Local 511, A.F.T., entered into a series of collective bargaining agreements between January 1, 1983, and December 31, 1999. Each of the agreements that were effective through December 31, 1991, included ERIPs with essentially the same terms and conditions.[2] In these agreements, the ERIPs allowed teachers who were at least 58 years of age but no older than 61 years of age to participate. The number of years of early retirement benefits decreased as the age of the teacher increased, from the age of 58 up to the age of 62, but no teacher would receive any early retirement incentive benefits after that teacher reached his or her 62nd birthday.

Another collective bargaining agreement (CBA) was adopted and was effective January 1, 1992, through December 31, 1993. The terms and conditions of this CBA were subsequently extended, with effective dates of January 1, 1994, through December 31, 1994. This CBA was in effect when the Plaintiff requested benefits under the ERIP. The ERIP in this CBA provides as follows:

ARTICLE XL

Early Retirement Incentive Program

A. Objective

The major objective of the Early Retirement Incentive Program is to make early retirement attractive to eligible teachers by providing incentives for retirement which do not create additional cost for the School City.

B. Eligibility

1. A teacher must have at least fifteen (15) years of creditable teaching service, ten (10) years of creditable teaching service must have been earned in the School City of East Chicago. Creditable teaching service must be in actual teaching duty, and leaves of absence (or LTD) shall not constitute creditable teaching service.

2. A teacher must have at least a bachelor's degree.

3. A teacher must be at least fifty-eight (58) years of age and no older than sixty-one (61) years of age as of June 30th.

4. An eligible teacher may receive up to a maximum of sixty (60) months of early retirement incentive pay according to the following schedule of maximum benefits.

a. Age fifty-seven (57) as of June 30—five (5) years of early retirement benefits.

b. Age fifty-eight (58) as of June 30—five (5) years of early retirement benefits.

c. Age fifty-nine (59) as of June 30—five (5) years of early retirement benefits.

d. Age sixty (60) as of June 30—five (5) years of early retirement benefits.

e. Age sixty-one (61) as of June 30—Four (4) years of early retirement benefits.

**2.** No copy of the agreement from January 1, 1983, through December 31, 1984, was submitted to the Court by the parties.

f. Age sixty-two (62) as of June 30—Three (3) years of early retirement benefits.

g. Age sixty-three (63) as of June 30—Two (2) years of early retirement benefits.

h. Age sixty-four (64) as of June 30—One (1) year of early retirement benefits.

5. An eligible teacher must notify the School City on forms provided by the Personnel Office of his intention to retire no later than March 1 of his last contracted school year. Retirements under this incentive program will commence on July 1 of the next fiscal year. The notification date for this year (1992) shall be extended until May 15, 1992. The notification date for this year (1992) for sick pay at retirement under Article XXXIII shall also be extended until May 15, 1992, however, sick pay at retirement shall not be paid to the early retiree until the fiscal year following the fiscal year of retirement.

6. All early retirements must be in units of an entire school year. There shall be no prorations.

C. Benefits

1. All early retirement incentive pay will be based on the following formula:

a. An eligible teacher who was paid on the master's degree salary lane or higher training salary lane during his last year under contract will receive annual compensation equal to sixty percent (60%) of the bachelor's degree, no experience.

b. An eligible teacher who was paid in the bachelor's degree salary lane during his last year under contract will receive annual compensation equal to fifty (50%) of the bachelor's degree, no experience.

c. The salary for a bachelor's degree, no experience, in effect at the time of early retirement will be used to calculate payments to the retiree and/or his estate. This base will remain constant during the period of early retirement and will not be subject to any negotiated increases.

2. Early retirement incentive pay will be paid on a monthly basis beginning in July.

3. Early retirement incentive payments will be made by check. Checks will be mailed by the Office of Business Services to the last known address of the teacher. It shall be the responsibility of the retiree to notify the School City, in writing, of any change of address.

4. Early retirement payments are in addition to other retirement benefits provided for in the Agreement.

D. Health Insurance

By giving notice prior to June 1st the teacher may have his annual compensation reduced by an amount equal to the annual premium of health insurance and the School City of East Chicago will pay that premium cost directly to the East Chicago Federation of Teachers Trust.

E. Continuation of Life Insurance

A teacher participating in the Early Retirement Incentive Program may continue to participate in the Group Life Insurance Plan by opting for such coverage. Notification shall be made to the School City within three (3) months of notification of retirement or by June 1, whichever date comes first, of the last year under contract. All costs of various life insurance premiums shall be paid by the retiree.

Pl.'s Ex. B3 56–59. The ERIP also has provisions for survivor benefits, reemploy-

ment after early retirement, and fiscal impact and program termination. Under this ERIP, teachers who retire between the ages of 58 and 60 receive the maximum 60 months of benefits. Teachers who qualify to participate in the ERIP but who retire at 60 years of age receive only 48 months of benefits. Teachers who would otherwise qualify to participate in the ERIP but who retire at 62 years of age or older receive no benefits.

Two other agreements were effective January 1, 1995, through December 31, 1996, and January 1, 1997, through December 31, 1999. The terms and conditions relating to retirement in these two agreements were substantially different from the agreements previously effective and involved a Social Security and Medicare Bridge Program.

Shortly after his 69th birthday, the Plaintiff requested that the Defendant recognize him as an eligible teacher under the ERIP and grant him benefits. Determining that the Plaintiff was not eligible because of his age, the Defendant denied his request to allow him to participate in the ERIP. On September 6, 1994, the Plaintiff filed his Complaint with the EEOC, claiming that the Defendant discriminated against him based upon the terms and provisions of the CBA effective January 1, 1992, through December 31, 1993.[3] The Plaintiff retired in July of 1995. During his last school year as an employee of the Defendant, the Plaintiff was paid under the doctorate degree salary lane in the sum of Fifty–One Thousand Forty and 38/100 dollars ($51,040.38).

## DISCUSSION

The Plaintiff in this case contends that the Defendant engaged in conduct prohibited under the ADEA. More specifically, the Plaintiff claims that the Defendant through the ERIP in its CBA discriminated against him based upon age.

### A. Conduct Prohibited Under the ADEA

The ADEA makes it unlawful for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. 29 U.S.C. § 623(a)(1). This bar extends to "virtually all employee benefits and benefit plans," S.Rep. No. 101–263, at 5 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1510, including early retirement plans. *See* 29 U.S.C. § 630(l). *See also Solon v. Gary Cmty. Sch. Corp.*, 180 F.3d 844, 849 (7th Cir. 1999). The United States Supreme Court has explained that the ADEA was created to prevent employment discrimination based on inaccurate and stigmatizing stereotypes pertaining to an individual's age. *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609–10, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

Although the Act's prohibitions originally applied only to individuals "at least forty years of age but less than sixty-five years of age," 81 Stat. 607, 29 U.S.C. § 631 (1964 ed., Supp. III), Congress subsequently removed the upper age limit, and the Act now covers individuals age 40 and over, 29 U.S.C. § 631(a). Any person aggrieved by an employer's violation of the Act "may bring a civil action in any court of competent jurisdiction" for legal or equitable relief. § 626(c)(1). Section 626(b) also permits aggrieved employees to enforce the Act through certain provisions of the Fair Labor Standards Act of 1938 (FLSA), and the ADEA specifically incorporates § 16(b) of the FLSA, 29 U.S.C. § 216(b).

---

**3.** The EEOC indicated that it would focus on this CBA in its investigation.

Although a disparate treatment theory of employment discrimination is available under the ADEA, *Hazen Paper,* 507 U.S. at 609–10, 113 S.Ct. 1701, a disparate impact theory is not, *Gehring v. Case Corp.,* 43 F.3d 340, 342 (7th Cir.1994); *EEOC v. Francis W. Parker Sch.,* 41 F.3d 1073, 1076–78 (7th Cir.1994); *Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1122, 1126 (7th Cir.1994). A plaintiff may prove age discrimination by presenting direct or circumstantial evidence that age was the determining factor in the employer's action. *Gadsby v. Norwalk Furniture Corp.,* 71 F.3d 1324, 1330 (7th Cir.1995); *Anderson,* 13 F.3d at 1122. In a disparate treatment case, liability depends on whether age actually motivated the employer's decision, and, thus, whatever the employer's actual decision-making process, age must have actually played a role in that process and have had a determinative influence on the outcome. *Hazen Paper,* 507 U.S. at 610, 113 S.Ct. 1701. When an employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes no longer exists. *Id.* at 611, 113 S.Ct. 1701. This is true even where the motivating factor corresponds to age, such as seniority. *Id. See also Francis W. Parker Sch.,* 41 F.3d at 1077; *EEOC v. G–K–G, Inc.,* 39 F.3d 740, 746 (7th Cir.1994). Thus, when a plaintiff shows that an employer varies eligibility for benefits on the basis of age, the plaintiff has established a prima facie case of age discrimination. *See Solon,* 180 F.3d at 852–53; *Karlen v. City Colleges of Chicago,* 837 F.2d 314, 318 (7th Cir.), *cert. denied,* 486 U.S. 1044, 108 S.Ct. 2038, 100 L.Ed.2d 622 (1988).

"[V]oluntary early retirement incentive plan[s] consistent with the relevant purpose or purposes" of the ADEA are not unlawful. 29 U.S.C. § 623(f)(2)(B)(ii). *See EEOC v. Crown Point Cmty. Sch.,* 1997 WL 54747, at *6–7 (N.D.Ind. Jan.2, 1997). Although it is not unlawful for an employer to offer an ERIP, it is however unlawful for an employer to condition early retirement benefits or reduce early retirement benefits on the employee's age. *Solon,* 180 F.3d at 854–55. In the Seventh Circuit, several courts have analyzed early retirement incentive plans under the ADEA and held that, when an employer elects to offer early retirement incentives, it must make those benefits available on nondiscriminatory terms, just as it must with any other fringe benefit. *See, e.g., Solon,* 180 F.3d at 852, 854; *Karlen,* 837 F.2d at 318; *Crown Point Cmty. Sch.,* 1997 WL 54747, at *5.

In *Karlen,* the Seventh Circuit reversed a district court's grant of summary judgment against the plaintiff—professors and for defendant—city colleges in a challenge to an early retirement incentive program that made employees between the ages of 55 and 69 eligible for early retirement but reduced the incentive to those between the ages of 65 and 69. *Karlen,* 837 F.2d at 320. The Seventh Circuit found that the retirement plan was not fully cost-justified and pointed out that the defendants did not even argue that the drop in benefits at age 65 was justified by the higher cost of benefits to a 65–year–old as compared to a 64–year–old. The Seventh Circuit stated:

Nothing in the Age Discrimination in Employment Act forbids an employer to vary employee benefits according to the cost to the employer; and if, because older workers cost more, the result of the employer's economizing efforts is disadvantageous to older workers, that is simply how the cookie crumbles.... But where, as in the present case, the employer uses age—not cost, or years of service, or salary—as the basis for varying retirement benefits, he had better be able to prove a close correlation between age and cost if he wants to shelter in the safe harbor of section 4(f)(2).... Otherwise, the inference of age discrimination will be strong—certainly strong enough

to defeat a motion for summary judgment by the party having the burden of persuasion, that is, the defendant.

*Id.* at 319. The Court added:

To withhold benefits from older persons in order to induce them to retire seems precisely the form of discrimination at which the Age Discrimination in Employment Act is aimed. Rather than offering a carrot to all workers 55 years and older, as in the *Henn [v. Nat'l Geographic Soc'y,* 819 F.2d 824 (7th Cir. 1987) ] case, [the defendants] are offering the whole carrot to workers 55 to 64 and taking back half for workers 65 to 69. The reason is that the [defendants] want to induce workers to retire by 65. In effect they have two early retirement programs; a munificent one for workers 55 to 64 and a chintzy one for workers 65 to 69.

*Karlen,* 837 F.2d at 320. The Court indicated that non-discriminatory motives, such as cost savings, are relevant to whether the defendant has satisfied the affirmative defenses in Section 623(f)(2). *Id.* at 318.

In *Solon,* the Seventh Circuit affirmed a district court's grant of summary judgment for the plaintiffs and against the Gary Community School Corporation and its finding that the school corporation had implemented a facially discriminatory ERIP that was explicitly age-based and thus violated the ADEA. *Solon,* 180 F.3d at 854–55. The *Solon* court summarized the facts as follows:

In this case, there is an equally obvious difference in the benefits that retirees will receive under the ERIPs depending upon their age. Those retiring at age 58 will receive four years of incentive payments, those retiring at age 60 only two years, and those retiring at age 62 or later, nothing. Those employees who elect to retire at 62 or later are put at a disadvantage for not retiring

when they were 58 to 61, no matter how "early" their later separation may be in terms of their length of service or previous retirement plans. And even for those within the 58 to 61 age group, we have exactly the situation that we did in *Karlen* —a full "carrot" for those aged 58, and an increasingly smaller piece of that carrot (25 percent less per year) for those closer to age 62. The amount of the benefits varies depending upon the retiree's age, nothing else. Just as in *Karlen,* the terms of the ERIPs establish a prima facie case of age discrimination. *Accord, E.E.O.C. v. Crown Point Community School Corp.,* 1997 WL 54747, at *5 (N.D.Ind. Jan.2, 1997) (Rodovich, M.J.).

*Solon,* 180 F.3d at 852–53. The court held that "[t]he district court was correct to presume discriminatory intent" because "[t]he terms of the ERIPs themselves explicitly established an employee's eligibility for the early retirement incentives in terms of his age" and because "[t]he plans are therefore discriminatory on their face, . . . and independent proof of an illicit motive is unnecessary." *Id.* at 855. The court also held that the age-based distinctions—reducing the benefits for those closer to the age of 62 and capping eligibility for the early retirement incentives at age 62—were arbitrary. *Id.*

In *Crown Point Community School Corporation,* another judge in the United States District Court for the Northern District of Indiana determined that the Crown Point Community School through an ERIP in its collective bargaining agreement discriminated against employees based upon age. The ERIP in that case applied to teachers who retired between the ages of 55 and 65 and expressly provided that teachers who retire between the ages of 61 and 65 would receive increasingly lower benefits for each year that they delayed retirement and that teachers age

65 and over would receive no early retirement benefits. The court held that age was used as a factor for determining the entitlement to benefits under the ERIP and that, because benefits were distributed based on age, the EEOC had established that the ERIP was facially discriminatory on the basis of age. *Crown Point Cmty. Sch. Corp.*, 1997 WL 54747, at *5.

A defendant bears the burden of proving any exception to the ADEA's broad prohibition. *Karlen*, 837 F.2d at 318. An employer may rely on age where it "is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business." § 623(f)(1). An employer may engage in conduct otherwise prohibited by § 623(a)(1) if the employer's action "is based on reasonable factors other than age," § 623(f)(1), or if the employer "discharge[s] or otherwise discipline[s] an individual for good cause," § 623(f)(3). In 1990, Congress amended the ADEA with the Older Workers Benefits Protection Act (OWBPA). 29 U.S.C. § 621 et seq. The intent of the OWBPA was to restore the original purposes of the ADEA with regard to age discrimination in employee benefits by clarifying the available affirmative defenses for employee benefit plans and reestablishing that the defendant bears the burden of proving them. Pub.L. No. 101–433, 1990 U.S.C.C.A.N. (104 Stat. 978) 1510. According to these statutory defenses, early retirement incentive plans are valid if they meet either of the following conditions: (1) the actual amount of the payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker, or (2) the plan is voluntary and consistent with the purposes of the ADEA. 29 U.S.C. §§ 623(f)(2)(B)(i) & (ii).

## B. Actors Governed by the ADEA

When first passed in 1967, the ADEA applied only to private employers. *See* 29 U.S.C. § 630(b) (1964 ed., Supp. III) (defining term "employer" to exclude "the United States, a corporation wholly owned by the Government of the United States, or a State or political subdivision thereof"). In 1974, Congress extended application of the ADEA's substantive requirements to the States. *See* Fair Labor Standards Amendments of 1974, § 28, 88 Stat. 74. The scope of coverage expanded through an amendment to the definition of "employer" contained in 29 U.S.C. § 630(b): "The term [employer] also means ... a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State. . . ." Congress also amended the ADEA's definition of "employee," still defining the term to mean "an individual employed by any employer," but excluding elected officials and appointed policymakers at the state and local levels. § 630(f). In the same 1974 Act, Congress amended 29 U.S.C. § 216(b) to permit an individual to bring a civil action "against any employer (including a public agency) in any Federal or State court of competent jurisdiction." Section 203(x) defines "[p]ublic agency" to include "the Government of a State or political subdivision thereof," and "any agency of ... a State, or a political subdivision of a State."

The United States Supreme Court, however, has recently limited the ADEA as it applies to state government actors based upon Eleventh Amendment immunity. *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the

United States by Citizens of another State, or by Citizens of Subjects of any Foreign State." Under the Eleventh Amendment, each state in our federal system remains a sovereign entity and may not be sued by an individual without its consent. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 72, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (citing *Hans v. Louisiana,* 134 U.S. 1, 13, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). *See also Gorka by Gorka v. Sullivan,* 82 F.3d 772, 774 (7th Cir.1996) (The Supreme Court has recently taken an "expansive view of sovereign immunity.") (citing *Seminole Tribe,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252). In addition to the state itself, the Eleventh Amendment bars suit against an entity when the defendant is an arm or alter ego of the state. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

■■■ Congress may constitutionally abrogate the states' Eleventh Amendment immunity if two criteria are satisfied: (1) Congress must unequivocally express its intent to abrogate the states' sovereign immunity; and (2) in abrogating that immunity, Congress must act pursuant to a valid exercise of power, such as its enforcement power under the Fourteenth Amendment. *Seminole Tribe,* 517 U.S. at 55, 72–73, 116 S.Ct. 1114; *Varner v. Illinois State Univ.,* 226 F.3d 927, 930–31 (7th

Cir.2000). Congress' commerce powers under Article I of the Constitution do not include the power to subject states to suit at the hands of private individuals. *Kimel,* 528 U.S. at 79–80, 120 S.Ct. 631; *Seminole Tribe,* 517 U.S. at 72–73, 116 S.Ct. 1114.

In *EEOC v. Wyoming,* 460 U.S. 226, 243, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), the Supreme Court held that the ADEA constituted a valid exercise of Congress' Article I power to regulate commerce among the states. However, in *Kimel,* the Court held that Congress in the ADEA did not validly abrogate the states' Eleventh Amendment immunity from suit by private individuals. *Id.,* 528 U.S. at 91, 120 S.Ct. 631. The *Kimel* Court held that, although the ADEA contained a clear statement of Congress' intent to abrogate the states' Eleventh Amendment immunity, that abrogation exceeded Congress' enforcement power under Section Five of the Fourteenth Amendment.[4] *Id.* at 81–92, 120 S.Ct. 631. Although Congress' general power to enact the ADEA now rests solely on the Commerce Clause in Article I of the Constitution, it nevertheless remains the law of the land and applies to government actors not sheltered by Eleventh Amendment immunity. *Kimel,* 528 U.S. at 78–79, 120 S.Ct. 631. *See also Horwitz v. Bd. of Educ. of Avoca,* No. 98–C–6490, 2000

---

**4.** Although the *Kimel* Court stated that "[a] review of the ADEA's legislative record as a whole ... reveals that Congress had virtually no reason to believe that state and local governments were unconstitutionally discriminating against their employees on the basis of age," *Kimel,* 528 U.S. at 91, 120 S.Ct. 631, the Court's mention of local governments there does not establish Eleventh Amendment immunity for local governments and was not an affirmative statement that local government actors are immune, that they are arms of the state, or that the ADEA would not apply to them. As the *Kimel* Court noted, the ADEA is validly enacted under the Commerce Clause. *See supra.* Instead, the Court's state-

ment applies to the lack of evidence of widespread and unconstitutional age discrimination by the states, the failure to find any significant pattern of unconstitutional discrimination that would lead Congress to believe that broad prophylactic legislation was necessary, and the limitations on Congress' "remedial," "enforcement" power under Section 5 of the Fourteenth Amendment. *Id.* at 81, 91, 120 S.Ct. 631 (citing *City of Boerne v. Flores,* 521 U.S. 507, 517–20, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). Whether a certain government actor is an instrumentality of the state is a determination made upon standards articulated by the Court elsewhere. *See infra.*

U.S.Dist. LEXIS 8021, at *7–10, 2000 WL 1100858, at *2–3 (N.D.Ill. June 7, 2000).

In determining whether a government actor is an arm of the state and thus sheltered by Eleventh Amendment immunity, the United States Supreme Court has instructed:

> The bar of the Eleventh Amendment to suit in federal courts extends to States and state officials in appropriate circumstances, *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ford Motor Co. v. Dept. of Treasury/*323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945)], but does not extend to counties and similar municipal corporations. *See Lincoln County v. Luning,* 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890); *Moor v. County of Alameda,* 411 U.S. 693, 717–721, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). The issue here thus turns on whether the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend. The answer depends, at least in part, upon the nature of the entity created by state law. Under Ohio law the "State" does not include "political subdivisions," and "political subdivisions" do include local school districts.... Petitioner [School Board] is but one of many local school boards within the State of Ohio. It is subject to some guidance from the State Board of Education, ... and receives a significant amount of money from the State.... But local school boards have extensive powers to issue bonds, ... and to levy taxes within certain restrictions of state law.... On balance, the record before us indicates that a local school board such as petitioner is more like a county or city than it is like an arm of the State. We therefore hold that [the School Board] was not entitled to assert any Eleventh Amendment immunity from suit in the federal courts.

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280–81, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (parallel and state statutory citations omitted).

In the Supreme Court's most recent Eleventh Amendment "arm of the state" case, *Hess v. Port Authority Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), the Court considered "indicators" of state entities: whether local or state governance controlled the entity; whether the implementing legislation characterized the entity as a state agency and how state courts have ruled on the issue; whether the entity's functions have traditionally been regarded as state or local; and whether a state has financial responsibility for the entity. *Id.* at 44–46, 115 S.Ct. 394. The Court instructed that Eleventh Amendment inquiries should be guided by the Eleventh Amendment's twin reasons for being: preventing judgments from depleting state treasuries, and maintaining "the integrity retained by each State in our federal system." *Id.* at 39, 47, 115 S.Ct. 394. When the indicators of immunity point in different directions, the Court instructed that the inquiry must focus upon "the impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of a State's treasury.... Accordingly, Courts of Appeals have recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations." *Id.* at 48, 115 S.Ct. 394 (citing *Baxter v. Vigo County Sch. Corp.,* 26 F.3d 728, 732–33 (7th Cir.1994) (most significant factor is whether entity has power to raise its own funds)).

The Seventh Circuit has not specifically instructed how, in light of the *Hess* decision, courts are to consider the various

factors in determining whether an entity or institution is an arm of the state, such that it would be sheltered by Eleventh Amendment immunity.[5] Nevertheless, a sampling of Seventh Circuit opinions indicates that a court should consider certain factors—the relationship between the state and the entity; the extent of the state's control over and supervision of the entity; the source of the entity's funding and the entity's ability to raise funds independently; the entity's degree of political independence from the state—and look to certain criteria—whether the state is financially responsible for liabilities and obligations incurred by the entity so that a judgment would ultimately be paid by the state's treasury; whether the entity acts as an agent of the state; and whether the function performed by the entity is traditionally a state or local function. *See Crosetto v. State Bar of Wisc.*, 12 F.3d 1396, 1402 (7th Cir.1993); *Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 777 (7th Cir.1991); *Kashani v. Purdue University*, 813 F.2d 843, 845 (7th Cir.1987); *Mackey v. Stanton*, 586 F.2d 1126, 1130–31 (7th Cir.1978).

The Seventh Circuit has held that county and local government entities are not arms of the state and thus not sheltered by Eleventh Amendment immunity. *See, e.g., Conley v. Village of Bedford Park*, 215 F.3d 703, 709 n. 3 (7th Cir.2000) (The Village "is considered a municipality, and not an arm of the state," and thus "may be sued in federal court."); *Gary A. v. New Trier High Sch. Dist. No. 203*, 796 F.2d 940, 945 (7th Cir.1986) (Even though a state provides some aid that may indirectly find its way into the plaintiff's pockets, "[a] local school district ordinarily is not a 'State' and hence may be sued in federal court for damages or other retroactive relief for violations of federal law or the constitution."); *Jensen v. State Bd. of Tax Comm'rs of the State of Ind.*, 763 F.2d 272, 279 (7th Cir.1985) ("Indiana counties now constitute the kind of independent governmental units that, by way of analogy, are not entitled to Indiana's Eleventh Amendment immunity.").

Title 34 of the Indiana Code governs Civil Procedure in Indiana, including tort claims against governmental entities and public employees. In defining "state agency" for "purposes of IC 34–13–3," Indiana Code section 34–6–2–141 states that "the term does not include a political subdivision." In defining "political subdivision," Indiana Code section 34–6–2–110 states that the term includes a "county, township, city, town, separate municipal corporation, ... school corporation, ... [or] board or commission of one of the[se] entities...."

In 1993, the Indiana Court of Appeals held that, "under Indiana law, an Indiana school corporation is not a local government unit but is an arm of the state for Eleventh Amendment purposes and is, therefore, not a 'person' amenable to suit under Section 1983." *Bd. of Trs. of Hamilton Heights Sch. Corp. v. Landry*, 622 N.E.2d 1019, 1025 (Ind.Ct.App.1993). However, on rehearing in 1994, the Indiana Court of Appeals reversed itself, holding that "an Indiana school corporation is not an arm of the state for Eleventh Amendment purposes and, therefore, is not immune from suit under Section 1983."

---

5. In *Thiel v. State Bar of Wisconsin*, 94 F.3d 399 (7th Cir.1996), the Seventh Circuit indicated that, "[w]ithout resolving whether [the plaintiffs' restatement of the *Hess* holding] is an accurate construction of *Hess*," the Supreme Court in *Seminole Tribe* had more recently asserted that the Eleventh Amendment does not exist solely to prevent federal court judgments that must be paid out of a state's treasury. *Id.* at 401. The Seventh Circuit added that it was unhesitatingly following the mode of analysis set forth in *Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396 (7th Cir. 1993), which it considered the appropriate mode of analysis. *Thiel*, 94 F.3d at 401 n. 3.

*Bd. of Trs. of Hamilton Heights Sch. Corp. v. Landry,* 638 N.E.2d 1261, 1266 (Ind.Ct. App.1994). In its decision on rehearing, the court supported its holding with the following reasoning:

"[A]lthough local school corporations receive a significant amount of state funding, they also have the power to levy taxes, to issue bonds, and to pay their own judgments," and thus they "possess[ ] the degree of financial autonomy which ... support[s] a determination that a school corporation [i]s not an arm of the state for purposes of Eleventh Amendment immunity" (citing IND.CODE § 20–4–1–26.9; IND.CODE § 20–5–2–2(13); IND.CODE § 20–5–4–1; IND.CODE § 20–5–2–2); "the definition of 'school corporation' includes 'any school city, school town, school township, consolidated school corporation, metropolitan school district, township school corporation, county school corporation, united school corporation, or any community school corporation" [6] (quoting IND.CODE § 20–6.1–1–5); the Budget Agency Act "expressly excludes 'cities, towns, townships, school cities, school towns, school townships, school districts, [and] other municipal corporations or political subdivisions of the state' from the definition of a state agency'" (quoting IND.CODE § 4–12–1–2); "the Tort Claims Act provides that a 'school corporation' is a 'political subdivision'" (quoting IND.CODE § 34–4–16.5–2); [7] "an Indiana school corporation has express statutory authority 'to sue and be sued and to enter into contracts'" (quoting IND.CODE § 20–5–2–2(1)); the local school corporation "is but one of many local school corpora-

tions in Indiana"; "Indiana has recently shifted its emphasis from centralized state control of education to greater local autonomy"; and "[i]n 1989, the School Corporation Home Rule Act was enacted by the General Assembly to 'grant school corporations all the powers that they need for the effective operation of each school corporation,' " "'places limitations upon the State's control by providing that 'State and other agencies may review or regulate the exercises of powers by a school corporation only to the extent prescribed by statute,' '" and "abrogated the common law rule that 'any doubt as to the existence of a power of a school corporation shall be resolved against its existence' " (quoting IND.CODE § 20–5–1.5–1; IND.CODE § 20–5–1.5–6; IND.CODE § 20–5–1.5–2; and citing IND. CODE § 20–5–1.5–3 and 4).

*Landry,* 638 N.E.2d at 1265.

In 1997, the Indiana Supreme Court held that county departments of public welfare are subordinate arms of the Indiana Department of Public Welfare and thus arms of the state and not a person amenable to suit under Section 1983. *J.A.W. v. State of Indiana,* 687 N.E.2d 1202, 1203 (Ind.1997). The court reasoned that the 1986 amendments to the public welfare code increased the level of state control over county departments of public welfare, increased the financial role of the state, deleted the authority of county indemnification, and transformed county departments of public welfare into subordinate agencies of the state so that they became financial agents of the state and county welfare funds effectively became special pools of state money. [8] *Id.* at 1213–

---

6. Under Indiana statutory law, "school corporation" means "any local public school corporation established under the laws of the state of Indiana, including but not limited to school cities...." IND.CODE § 20–5–1–3(a).

7. Indiana Code section 34–4 was repealed by Public Law No. 1–1998, § 221, effective July 1, 1998.

8. In the *J.A.W.* decision, the court referred to the Seventh Circuit opinions in *Baxter,* 26 F.3d at 732–33, and *Mackey,* 586 F.2d at

15 (citing Act of Mar. 12, 1986, Pub.L. No. 16–1986, 1986 Ind. Acts 403; Title 12 of the Indiana Code). The court concluded that after the 1986 amendments, "the state, operating through county departments and county governments, became responsible for all public welfare debts and judgments against county departments." *Id.* at 1215. Because this decision analyzed county departments of public welfare under the statutory scheme enacted in Public Law No. 16–1986, which reformed the Indiana public welfare code but not the Indiana education code, it is inapplicable to the present case, which involves a local school corporation.

Since the Supreme Court's decision in *Kimel,* federal courts have continued to hold that local governments and school corporations are not arms of the state for Eleventh Amendment purposes and thus that the ADEA continues to apply to them. *See, e.g., Narin v. Lower Merion Sch. Dist.,* 206 F.3d 323, 331 n. 6 (3d Cir.2000) ("[The school district] contends that the Supreme Court's decision in *Kimel* ... renders the ADEA inapplicable to [the school district]. This contention is meritless.... [The school district ... is not a state or an arm of the state for Eleventh Amendment purposes and therefore is not entitled to sovereign immunity."); *Horwitz,* 2000 WL 1100858, at *3, 2000 U.S.Dist. LEXIS 8021, at *10 ("[B]ecause the ADEA applies to local governments, and political subdivisions of states, and because Defendants [including the Board of Education of Avoca] do not enjoy Eleventh Amendment immunity, this Court has jurisdiction...."); *EEOC v. Hickman Mills Consol. Sch. Dist. No. 1,* 99

F.Supp.2d 1070, 1080 (W.D.Mo.2000) ("The Eighth Circuit has ruled that school boards are not entitled to the immunity provided by the eleventh amendment.... A school district is not in the same position as a state or a state agency for eleventh amendment purposes.") (citations omitted).

### C. ANALYSIS

■ The Court now finds as a matter of law that the School City of East Chicago is a "school corporation" under Indiana law, and thus it is a political subdivision but neither a state agency nor an arm or instrumentality of the State of Indiana. Eleventh Amendment immunity, therefore, does not shelter the Defendant from suit by a private litigant in this Court. The decision of the Supreme Court of the United States in *Kimel* does not immunize the Defendant from suit and does not strip this Court of jurisdiction, as claimed by the Defendant. As a valid enactment of Congress under the Commerce Clause, the ADEA applies to the Defendant and governs its conduct.

■ The terms and conditions of the ERIP in the CBA implemented by the Defendant are substantially similar to the terms and conditions of the ERIP determined to be discriminatory in the *Solon v. Gary Community School* and *EEOC v. Crown Point Community School* cases. *See Solon,* 180 F.3d at 846–49, 852–53, 855; *Crown Point Cmty. Sch. Corp.,* 1997 WL 54747, at *1–2, *5–7. The Court finds in this case that, under the ERIP, age is used as a factor for determining the entitlement to early retirement benefits and that the

1130–31, stating that "[c]ourts holding that the county departments were arms of the counties and amenable to suit under § 1983 have focused on these fiscal obligations of the county governments" but "[w]e think those courts gave too little weight to our prior construction of Indiana law in attributing such

significance to these fiscal matters." *J.A.W.,* 687 N.E.2d at 1214. The context surrounding the court's remarks makes it clear that the remarks were directed to analysis involving county departments of public welfare, not local school corporations. *See id.*

terms and conditions explicitly establish an employee's eligibility for the early retirement incentives in terms of his age. In other words, the ERIP doles out benefits based upon age, with younger workers receiving better benefits. The Court finds, therefore, that the ERIP is facially discriminatory on the basis of age.

The Defendant has offered nothing to rebut this finding and, in fact, has more or less agreed.[9] *See* Memo. of Def. at 2, 8–9. Furthermore, although the Defendant asserted defenses in its Answer, the Defendant in its Memorandum in Opposition to the Plaintiff's Motion has not established that its decision was motivated by a factor other than age, has not argued that any of the defenses under the ADEA applies, and has not presented any evidence in support of any such defenses. The Court will not make these arguments for the party. *See Tyler v. Runyon,* 70 F.3d 458, 464–65 (7th Cir.1995); *Weissman v. Weener,* 12 F.3d 84, 86 (7th Cir.1993).

Based upon the record before this Court, the Court finds that there is no genuine issue as to any material fact and that the Plaintiff is entitled to judgment as a matter of law against the Defendant.

## CONCLUSION

For all the foregoing reasons and pursuant to Federal Rule of Civil Procedure 56, the Plaintiff's Motion for Summary Judgment on Liability as to Defendant, School City of East Chicago [DE 35] is hereby GRANTED.

This matter is set for status hearing on damages on Monday, March 12, 2001, at 10:00 a.m., United States Courthouse, Hammond, Indiana.

9. The Defendant opposes the Plaintiff's Motion for Summary Judgment solely upon its argument that this Court does not have the power to enforce the ADEA against it because of the *Kimel* decision and Eleventh Amendment immunity. Because the Defendant's contention is meritless and because this contention was the sole ground for its opposition, this Court under the summary judgment standard of review accepts the facts as claimed and supported by admissible evidence by the Plaintiff.